JACKSON MARTINDELL, *et al.*, Appellants, *vs.* LAKE SHORE NATIONAL BANK, Admr., *et al.*, Appellees.

*Opinion filed December 16, 1958.*

LORD, BISSELL & BROOK, of Chicago, (L. DUNCAN LLOYD, NEWELL S. BOARDMAN, and WILLIAM H. HILLIER, of counsel,) for appellants.

McBRIDE, BAKER, WIENKE & SCHLOSSER, of Chicago, (L. M. McBRIDE, and ROBERT B. GERRIE, of counsel,) for appellees.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

This cause presents the issue of whether Jackson Martindell, herein referred to as plaintiff, is entitled to specific performance of an option contract to purchase 67 per cent of the debentures and stock of Marquis-Who's Who, Inc., a not-for-profit corporation which publishes *Who's Who in America* and similar publications. The circuit court of Cook County granted such relief upon plaintiff's motion for a summary decree but, upon review, the decree was reversed and specific performance denied by the Appellate Court. (*Martindell* v. *Lake Shore National Bank,* 15 Ill. App. 2d 217.) We have granted plaintiff's petition for further review.

From the pleadings, exhibits, documents and affidavits upon which the summary decree was based, it appears that Wheeler Sammons, Sr., and his wife, Dorothy W. Sammons, had, for a long time prior to 1951, been engaged as partners in the publishing business under the name and

style of The A. N. Marquis Company, with principal offices in the city of Chicago. A son, Wheeler, Jr., was employed by the company in the late 1940's but was not so engaged when the first events which led to this litigation occurred. In 1951, Sammons, Sr., conducted various negotiations for the sale of the business or for financial backing which would assure the perpetuation of the enterprise. He was also interested in establishing a public library of biographies with the data collected by *Who's Who* publications as a nucleus. At the time in question the plaintiff was a New York resident and the president and a director of American Institute of Management, a not-for-profit corporation established for research into the techniques and principles of management. Sammons learned of the plaintiff from a mutual friend and, in writing to such friend in June, 1951, Sammons stated: "If you feel he is the man to carry on 'Who's Who—I'd rely on your judgment. * * * For reasons of which you know, I now do not have any cause, as I have had heretofore, for aiming toward 'familial successorial perpetuation,' * * *." In a subsequent letter of June, 1952, to the same man, who was ultimately plaintiff's attorney in the transaction, Sammons stated that he understood plaintiff was coming to Chicago and remarked: "I am quite convinced of the desirability of working out some way to have 'Who's Who' his responsibility when my stint is over, and I hope something can be worked out." Further showing the development of a friendly relationship between Sammons and the plaintiff, the latter's complaint alleges, and the answer of Dorothy W. Sammons admits, that Sammons was made a director of the American Institute of Management and received 10 per cent of its paid-in stock.

Preliminary negotiations between plaintiff and Sammons culminated in a conference between them and their attorneys in New York City on May 8, 1952. Upon the basis of agreements reached at this meeting Sammons's attorney

drew up a written agreement which the plaintiff, Sammons, and the latter's wife signed on October 2, 1952. This instrument, which the parties refer to as the "master agreement," designated the plaintiff as "buyer" and the Sammonses as "sellers," and, as aptly stated by the Appellate Court, was a comprehensive plan by which the Sammonses could obtain the necessary financing to continue and remain active in the publishing business, receive an income from the net profits of the business, establish a biographical library, and at the same time provide for the perpetuation of the publishing business and the library in the event the sellers ceased to remain active by virtue of retirement, disability or death. Additionally, the agreement recited that the buyer was interested in creating and maintaining a library, and that he was also desirous of assuring the continuity of the library project and the publishing business.

To carry out the purposes of the agreement, the sellers first agreed to organize a not-for-profit corporation authorized to issue 425 shares of capital stock with a par value of $3 a share, to be paid for by the sellers in cash at par. After the organization of such corporation the plaintiff-buyer agreed to lend the sellers $125,000 in cash for a period of 20 years at 5 per cent interest, such loan to be secured by a mortgage on the building in which the sellers had conducted their publishing business, by the assignment of any leases on the building, and by a pledge of certain debentures, with a face value of $125,000, which were to be issued to the sellers by the new corporation. By a third provision the sellers were required to transfer the $125,000 in cash and all the capital assets of their partnership to the new corporation, and to receive in return $425,000 worth of debentures to be issued by the new corporation. These were long term debentures bearing 5 per cent interest and were to mature serially at the rate of $50,000 a year starting 12 years after their date of issue and concluding 20 years thereafter, the agreement providing that the new

corporation could redeem its debentures but, if there was any redemption, the debentures pledged to plaintiff were to be redeemed in full before any other debentures could be redeemed in whole or in part. By a succeeding provision the sellers agreed to lease their building to the new corporation for a period of 20 years, and to cause the corporate lessee to provide for, staff and contribute to the biographical library. Thereafter it was agreed that Wheeler Sammons should be continued as chief executive and general manager of the new corporation at a salary of not less than $12,000 per annum, and that the new corporation should have the privilege of employing Mrs. Sammons and Elizabeth Connor, the latter a daughter of the sellers.

Most significant of the remaining provisions of the agreement was one which provided that the buyer or his nominee should have, and that the sellers granted, the following options: (a) After 10 years from the issue date of the debentures, the right at any time to purchase up to but not in excess of 67 per cent of the original principal amount of the debentures, the sellers being obligated to assign to the buyer one share of stock for each $1,000 in principal amount of the debentures. Contained within this option was the following language: "Debentures paid and discharged by the corporation shall not thereafter be available for purchase by the Buyer under this option." Thereafter subparagraph (b) of the option provision gave plaintiff a right, after 10 years, to purchase the business building for the sum of $125,000, while subparagraph (c) accelerated the option date in the event of Wheeler Sammons's voluntary retirement or death before a 10-year period had elapsed. With respect to his death, which did occur, the option date was advanced to the date his administrator or executor was appointed and continued for six months thereafter. Still another provision of the option clause was as follows: "In the event that the Buyer chooses to exercise any of the options hereunder, he shall notify the sellers or their per-

sonal representative or representatives, as the case may be, not less than thirty days in advance of the date specified in said notice for the exercise of said option."

Pursuant to the terms of the master agreement the Marquis-Who's Who corporation was formed on February 20, 1953, and Sammons and his wife purchased its 425 shares of common stock for $1,275. Plaintiff loaned the $125,000 to the Sammonses, which was evidenced by a note upon which there was no personal liability, secured by a mortgage on the building owned by the Sammonses and used by the corporation. The Sammonses transferred the partnership assets of the A. N. Marquis Company to the corporation, including the $125,000 received from the plaintiff, and received in exchange $425,000 in debentures issued by the new corporation. Debentures numbered one, two and three, totalling $125,000, were pledged to the plaintiff as agreed. The remaining seven bonds, having a value of $300,000, were in possession of Sammons and his wife and it appears that their undivided interests in them were, respectively, twenty per cent and eighty per cent.

The debentures each contained the following provision: "The right is hereby reserved to the corporation to redeem this bond at any time by the payment of the principal hereof and interest thereon, to the date of redemption; provided, however, that if there be any bond or bonds outstanding with a lower serial number, such bond or bonds shall be redeemed first." Similarly, the pledge agreement executed and delivered to the plaintiff had the following provision: "If the pledgors shall repay the above described principal sum of One Hundred Twenty-five Thousand ($125,000.00) Dollars, together with all interest due thereon, on or before the maturity thereof, then, in such event, the pledgee shall deliver back to the pledgors all of the said debenture bonds remaining unpaid, and shall reassign said bonds to the pledgors * * *. In the event any of said debenture bonds are redeemed by the obligor corporation the proceeds of

such redemption shall be applied by the pledgee first in payment of interest due on the above described principal sum and the remainder on account of the principal balance then remaining unpaid."

Wheeler Sammons, Sr., died on February 21, 1956, and, at that time, was a director of the corporation along with his wife and Lloyd M. McBride, their attorney. Sammons was president and treasurer and his son, Wheeler, Jr., who had returned to the business in 1953, was secretary. Letters of administration with will annexed were issued to Lake Shore National Bank on March 5, 1956, and by the terms of the agreement plaintiff had six months from this date to exercise his option. On the same day, however, the shareholders of the corporation, namely, Mrs. Sammons and the administrator, both of whom made Wheeler, Jr., their proxy for the purpose, elected Wheeler, Jr., as a director. The board, in turn, accepted Wheeler's resignation as secretary, elected him to the offices of president and treasurer, and elected McBride as secretary. With reorganization accomplished, the new board passed a resolution to redeem the ten debenture bonds and, in connection therewith, Wheeler, Jr., explained that his mother had agreed to loan the corporation $240,000 and to consummate the loan by accepting a demand note of the corporation in the principal sum of $240,000, bearing interest at the rate of 6 per cent per annum, in full payment and discharge of her 80 per cent undivided ownership of the bonds bearing serial numbers 4 to 10 inclusive. The directors then authorized that transaction. On the same date, March 5, 1956, the corporation drew a check for $185,000 on its account at The First National Bank of Chicago payable to the Lake Shore National Bank, in Chicago, for the establishment of a "Debenture Retirement Fund" account at that bank.

Still on the same day, March 5, 1956, the corporation and the attorneys for Mrs. Sammons and the estate of the senior Sammons, each sent plaintiff a letter. The com-

munication from the corporation advised plaintiff of the steps taken for the redemption of the debentures held by him as pledgee, and stated that the sum for the payment of the principal due on the bonds was on deposit in a special account at the Lake Shore National Bank. The letter from the attorneys for the estate and Mrs. Sammons likewise advised plaintiff of the steps taken for the redemption of the bonds and stated that they had authorized and directed the corporation to apply the money set aside in the debenture fund to the payment of the principal and interest due on note executed to plaintiff by the Sammonses. Concluding, the letter requested the surrender of the principal note and all documents held by plaintiff as collateral security, advised him that interest on the principal note had been prepaid to March 26, 1956, and requested him to present all necessary papers to Marquis-Who's Who. Inc., on or before March 10, 1956.

On March 6, 1956, pursuant to the resolution of the preceding day, the corporation issued a 6 per cent demand note to Mrs. Sammons in the principal amount of $240,000 and drew and delivered a check for $60,000 on the debenture account at the Lake Shore National Bank payable to the estate of Sammons, Sr. Both the administrator and Mrs. Sammons accepted these transactions as payment of their respective interests in the debentures.

On March 7, 1956, plaintiff sent registered letters and telegrams to Mrs. Sammons, the administrator, and to the president and secretary of the corporation, in which he stated his election to exercise his option to purchase 67 per cent of the debentures and 67 per cent of the common stock in accordance with the master agreement of October 2, 1952. In his letter he stated that he was prepared to execute all necessary documents to make the payments contemplated in connection with the transfer. Although plaintiff did not give advance notice of his intention to exercise his option, as required by the agreement, we agree

that such a notice would have been useless in view of the optionors' attitude of repudiation. (See: *Laegeler* v. *Bartlett*, 10 Ill.2d 478; *Lewis* v. *McCreedy*, 378 Ill. 264.) To specifically enforce his option, the plaintiff instituted the present action in the circuit court of Cook County where, upon his motion for a summary decree, a decree of specific performance was entered June 22, 1956.

In seeking equitable relief, plaintiff has pursued two theories, the first being that the agreement obligated the Sammonses to hold his option open for a period of six months after the death of Sammons, Sr., and, second, that the debentures pledged to him were not "paid and discharged," either in law or in fact, at the time he elected to exercise his option to purchase 67 per cent of the debentures and stock. The trial court held for the plaintiff in both respects. Upon appeal, however, the Appellate Court, after indicating that it considered the business perpetuation and library purposes of the agreement to be "secondary" to the loan and security purposes, held that the purported option granted by the agreement was in effect but a revocable offer which had been revoked when the debentures were redeemed by the corporation, and that the pledged debentures had been effectively paid and discharged prior to the plaintiff's attempt to exercise his option. In granting plaintiff's petition for leave to appeal to this court, our concern is with the question of whether the parties to the agreement intended the option granted to plaintiff to be a mere revocable offer even after the occurrence of the event which gave him the right to exercise it.

The agreement is not without ambiguity and inconsistency, nor can it be said that the intent of the parties is crystal clear from its terms. Although the Appellate Court dismissed it as being for the primary purpose of creating a relationship of lender and borrower, the agreement itself manifests a different intent when it fixes the relationship of the parties as being buyer and seller, and

when it states two of the mutual purposes for the agreement to be the creation and maintenance of a library and the continuation of the seller's publishing business. Further detracting from a conclusion that only a loan arrangement was intended are those provisions which spell out the formation of a corporation to carry out the purposes of the agreement, and those which go as far as to provide that certain persons could be employed by the corporation to be formed. Nor does it appear that the financial needs of the sellers, or their publishing business, was an entirely compelling circumstance upon them. Negotiations were carried on for approximately a year before a written agreement was drawn and signed and, during that period, the sellers' only concern appears to have been to gain satisfaction that the plaintiff-buyer was a proper person to continue as publisher of *Who's Who,* once Wheeler Sammons died or retired. The tenor of letters from Sammons to interested friends prior to the execution of the written agreement was that plaintiff was entirely acceptable as his successor, and he expressed the hope that something could be "worked out."

As drawn, the agreement clearly reflects that something more than a loan and security arrangement was intended and, apparently to effectuate the stated purpose of providing for the perpetuation of the publishing business, granted plaintiff a right, 10 years after the corporate debentures were issued, to purchase 67 per cent of the debentures and stock. Then, in apparent limitation on the intentions previously expressed and the right granted to plaintiff, the first paragraph of the option agreement contained the following clause: "Debentures paid and discharged by the new corporation shall not thereafter be available for purchase by the Buyer under this option." A subsequent paragraph of the option provision provides that, in the event of the death of Wheeler Sammons before 10 years had elapsed, the election date of plaintiff's option was to be

accelerated to a date coincidental with the issuance of letters in his estate, and while the paragraph fixes the duration of the option at six months in such case, there is no express provision giving the corporation authority to redeem its debentures during the six-months period.

In his motion for a summary decree and in his argument to this court, plaintiff had advanced the construction that the clause above quoted was intended to be limited to redemptions made in the usual course of business and for proper corporate purposes, and asserts that it was not intended to relieve the sellers from their contractual obligation to hold his option open for a six-months period after the death of Sammons, Sr. Defendants, for their part, deny that the Sammonses had irrevocably cast their lot with the plaintiff, and contend that the clause was deliberately and knowingly inserted, the intention of the parties being that plaintiff would at all times have but a contingent option, which could be terminated at any time by payment and discharge of the corporate debentures, thus affording the Sammonses a period during which they could decide if plaintiff was in fact the party best fitted to carry on the name and tradition of *Who's Who*. In other words, it is plaintiff's contention that the clause in the first paragraph of the option provision was not intended to provide the sellers with the means of accomplishing a complete forfeiture of his option rights once the death of Wheeler Sammons presented him with the opportunity of exercising such rights. As opposed to this, defendants insist that plaintiff's option rights, accelerated or not, were at all times contingent upon the right of the corporation to redeem its debentures. The whole issue then is whether the clause putting a contingency upon plaintiff's rights was intended by the parties to have effect even after the date for their exercise had been accelerated by the death of Sammons.

The conclusion of the Appellate Court that the contract between the parties was just a security arrangement, and

that plaintiff's right to purchase debentures and stock was but a revocable offer, appears to be predicated to a great extent upon a single sentence of the option clause which states: "Debentures paid and discharged by the new corporation shall not thereafter be available for purchase by the Buyer under this option." Because of this language the court has held that any other intentions expressed by the parties become secondary. A contract, however, is to be construed as a whole, giving meaning and effect to every provision thereof, if possible, since it will be presumed that everything in the contract was inserted deliberately and for a purpose. (*Hartley* v. *Red Ball Transit Co.* 344 Ill. 534.) The intention of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself, but each part of the instrument should be viewed in the light of the other parts. *Chicago Home for Girls* v. *Carr,* 300 Ill. 478; 12 I.L.P., Contracts, sec. 215.

The primary object of the construction of a contract is to give effect to the intention of the parties, greater regard being given to such intent, when clearly revealed, than to any particular words used in expression thereof. (*United States Trust Co.* v. *Jones,* 414 Ill. 265; *Guhl* v. *Guhl,* 376 Ill. 100, 12 I.L.P., Contracts, sec. 212.) In general, the intention of the parties is to be determined from the final agreement executed by them, rather than from preliminary negotiations and agreements, (*Clark* v. *Mallory,* 185 Ill. 227,) but previous agreements, negotiations and circumstances may be considered in determining the meaning of specific words and clauses. (*Koelmel* v. *Kaelin,* 374 Ill. 204; 12 I.L.P., Contracts, sec. 215.) Similarly, under well recognized exceptions to the parole evidence rule, extrinsic evidence is admissible to show the meaning of words used in a contract where there is an ambiguity, or when the language is susceptible of more than one meaning. (*Adams* v. *Gordon,* 265 Ill. 87; *Evans*

v. *Gerry,* 174 Ill. 595; *Hogan* v. *Wallace,* 166 Ill. 328; Restatement of Contracts, sec. 238(a).) When these rules of construction are applied in the present case, it is our opinion that the parties did not intend the narrow construction arrived at by the Appellate Court.

As has already been detailed, the agreement describes the parties as buyer and seller and embraces details of the new corporation and its employees that are foreign to the average security agreement. Looking next to the option provision of the agreement in its entirety, it is patently obvious from the terms employed that the parties contemplated the plaintiff would have more than the mere revocable offer to purchase found by the Appellate Court. The purport of the language is, rather, that the entire provision was inserted in fulfillment of the parties' stated purpose of providing for the continuity of the publishing business biographical library. The preamble thereto states: "The Buyer, or his nominee, *shall have* and by this agreement the Sellers *do grant,"* certain options. (Emphasis supplied.) Thereafter subparagraph (a) gave plaintiff an option to purchase 67 per cent of the debentures and stock ten years after the issue date of the debentures; subparagraph (b) gave him an unconditional option to purchase the business building after ten years; subparagraph (c) accelerated plaintiff's option rights in event of the death or retirement of Sammons, and thus provided for the continuity of the business; subparagraph (e) granted plaintiff a first refusal in event the Sammonses should exercise their right to sell the 33 per cent of the debentures and stock not subject to plaintiff's option; and subparagraph (g) granted plaintiff the right, should he exercise the option granted in subparagraph (a), to require the Sammonses to discharge the principal indebtedness of the $125,000 mortgage on their building by assignment of stock and debentures to the plaintiff.

Apart from the express language of the agreement, the intention manifested during preliminary negotiations, as well

as the circumstances surrounding the execution of the contract, overcome the conclusion that the parties contemplated only a relationship of lender and borrower. Providing security for the plaintiff's loan was indeed one purpose of the agreement, but it is apparent that the parties attached equal importance, if not more, to their stated purpose of assuring the continued operation of the publishing business and library. There is neither claim nor showing that the publishing business was in such dire financial need that its operation or existence would have been threatened had a loan not been procured, nor is there any showing that plaintiff, or the organization of which he was an officer, was in the business or practice of loaning money. The whole impact of the record is, rather, that the Sammonses had given up any hope for familial succession in the business and that their principal preoccupations and purposes were, first, the establishment of a biographical library and, second, the finding of a suitable successor to continue the publication of *Who's Who* once they were no longer active. Letters written by Sammons prior to the execution of the formal agreement indicate he had settled on plaintiff as his successor, and that he entered into negotiations with the hope that such an end would be accomplished. As to the plaintiff, the record reveals he was qualified by experience, position and financial ability to continue both the library and the publishing business, and that ultimate acquisition of both, rather than monetary gain, was the factor which motivated his action of entering into the agreement. Likewise the conduct of the parties after the agreement was executed is indicative of the intention to enter into something more than the impersonal relationship of lender and borrower. The record shows that plaintiff's organization, the American Institute of Management, and the new *Who's Who* corporation thereafter became collaborators in several publishing projects, a privilege granted the new corporation by the agreement of the parties.

When the instrument is construed in light of all its provisions and with a view to the intent to be gathered from the extrinsic evidence, we cannot agree that the limiting sentence in the option provision was intended by the parties to reduce the agreement to a security arrangement or to shrink the rights expressly granted plaintiff to the status of an offer revocable at the pleasure of the new corporation. Every contract implies good faith and fair dealing between the parties to it, and where an instrument is susceptible of two conflicting constructions, one which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted. (12 I.L.P., Contracts, sec. 217.) In the present case the only limitation on plaintiff's option to purchase is that debentures "paid and discharged by the new corporation" would not thereafter be available for purchase under his option. From the entire record, it is our opinion that this limitation has reference only to *bona fide* redemptions made by the corporation in the normal course of business. Otherwise, as is demonstrated by the result reached in the Appellate Court, the new corporation, even though it was not a party to the agreement, must be said to have remained in a position to accomplish a complete forfeiture of plaintiff's rights even after the time to exercise such rights had been reached. Most certainly no concept of good faith or fair dealing permits a construction that the limitation was intended to reach corporate redemptions financed by the sellers for the sole purpose of avoiding the plaintiff's option rights. Such a construction is inconsistent with the unequivocal language by which the plaintiff was granted option rights, and renders meaningless those portions of the agreement whereby the parties sought to give effect to their expressed purpose of providing for the continuity of the publishing business. Further, it is to be noted that the limiting sentence, as it appears in the context of the option clause, is made to refer to time during which Sammons had not yet

died or retired. It is by no means a clear inference that the same limitation was to prevail when the option period had been shortened to six months by the event of Sammons's death.

Moreover, in construing the intention of the parties with respect to the limitation, we think it is significant that the new corporation was not even a party to the agreement. Not being bound by the agreement, it is extremely doubtful that it was intended for this corporation to have the arbitrary power to terminate plaintiff's option rights. The only parties to the agreement were, rather, the Sammonses, described therein as "sellers," and the plaintiff, who is described as "buyer." The agreement specifies in detail the option rights granted, the time they could be exercised, and made specific provision for an acceleration date in event of the death or retirement of Sammons. No specific provision was made giving the sellers the power to terminate plaintiff's rights, as might have been done, and we agree with plaintiff that any construction that the corporation's redemption rights gave the Sammonses the power to terminate plaintiff's option is a commingling of corporate and individual rights which defeats the stated purpose of the contracting parties to provide for the perpetuation of the publishing business.

For the reasons stated it is our conclusion that it was not the intent of the contracting parties to invest the corporation with an arbitrary power to terminate and destroy plaintiff's option to purchase debentures and stock once his right to do so had been accelerated by the death of Wheeler Sammons. Accordingly, we hold that the redemption here was ineffective and that plaintiff, who elected to exercise his option in a lawful manner, is entitled to specific performance of the agreement. The judgment of the Appellate Court for the First District is reversed, and the decree of the circuit court of Cook County is affirmed.

*Appellate Court reversed; circuit court affirmed.*