COLES-MOULTRIE ELECTRIC COOPERATIVE, Plaintiff-Appellant, v. THE CITY OF SULLIVAN, Defendant-Appellee.

Fourth District    No. 4—98—0271

Argued October 13, 1998.—Opinion filed March 2, 1999.

COOK, J., specially concurring.

William A. Sunderman (argued) and Kristin L. Wilson, both of Brainard Law Offices, of Charleston, for appellant.

Troy A. Fodor (argued), of Douglas G. Brown, P.C., of Springfield, for appellee.

JUSTICE KNECHT delivered the opinion of the court:

Plaintiff, Coles-Moultrie Electric Cooperative (Cooperative), appeals the dismissal of a September 1997 action brought to enjoin defendant, City of Sullivan (Sullivan), from providing electrical service to specifically described tracts outside its corporate city limits. Plaintiff offered as a bar to the city's attempt to service these areas a June 1992 written agreement (Agreement) that was intended to settle disputed service areas and provide for reimbursement of plaintiff for providing services to areas annexed to the city. In December 1997, the trial court denied the injunction, finding the Agreement to be a waiver by plaintiff of the entitlement to service the areas in question within the meaning of section 11—117—1 of the Illinois Municipal Code (Ill. Rev. Stat. 1991, ch. 24, par. 11—117—1 (now 65 ILCS 5/11—117—1 (West 1996))). Plaintiff appeals. We affirm.

## I. BACKGROUND

The Cooperative is an Illinois not-for-profit corporation engaged in the distribution of electrical energy in and around Moultrie County, Illinois. Sullivan is an Illinois municipal corporation operating an electrical generation and distribution system pursuant to the Illinois Municipal Code. 65 ILCS 5/11—117—1 *et seq.* (West 1996).

On June 29, 1992, the Cooperative and Sullivan entered into an agreement designed to provide for a resolution of territorial disputes relating to property in and near Sullivan. The Agreement makes certain acknowledgements about Sullivan's legal right to serve a property referred to as the "Elder Tract or Old Peadro Farm," defines the "existing service territory" of the respective parties, and provides for the purchase of stranded facilities of the Cooperative by Sullivan.

The Agreement, which was attached to plaintiff's complaint, includes three attachments. Appendix A is the legal description of the area described as the "Elder Tract or Old Peadro Farm." Appendix B is a map designating the "existing service territories" of the parties as agreed to in paragraph 3 of the Agreement. Appendix C is a list of electric facilities located on the "Elder Tract or Old Peadro Farm" that were to be acquired from the Cooperative by Sullivan pursuant to paragraph 4 of the Agreement.

The complaint alleges Sullivan notified the Cooperative of its intent to provide electric service to two specifically defined areas, described in counts I and II, respectively, which are not located within the corporate limits of Sullivan. The Cooperative alleges the servicing of these areas without prior annexation by Sullivan is in direct violation of the terms and conditions of the Agreement. Plaintiff contends Sullivan by the terms of the Agreement is required to annex the disputed properties *before* it can exercise its right to provide electric service. Defendant Sullivan argues both of the disputed areas are within its "existing service territory" as designated in the Agreement and, therefore, do not require annexation for it to exercise its right to service these areas per the terms of the Agreement.

Plaintiff filed its complaint on September 19, 1997, asserting breach of contract by Sullivan with respect to the planned electric service to the two disputed areas and requesting a permanent injunction. On October 27, 1997, Sullivan filed a motion to dismiss in two counts. Count I of the motion to dismiss was pursuant to section 2—615 of the Code of Civil Procedure (Code) (735 ILCS 5/2—615 (West 1996)) and argued failure to include certain essential parties to the cause of action. Count II argued the Agreement was a resolution of a territorial dispute over service rights that was "clear and unambiguous," foreclosing plaintiff's cause of action.

In reply to Sullivan's motion to dismiss, the Cooperative filed the affidavit of John W. Dooley, who served as administrative assistant to the general manager of the Cooperative in 1992 and was instrumental in negotiating the Agreement with Sullivan. In his affidavit, Dooley provides information as to the Cooperative's purpose and intent with respect to the Agreement executed with Sullivan.

The trial court denied count I of Sullivan's motion to dismiss for failure to join a necessary party. With respect to count II of Sullivan's motion to dismiss, the trial court found the Agreement was "clear and unambiguous" in its terms and in so doing disregarded parol evidence, in this case the affidavit of John W. Dooley offered by the plaintiff. Pursuant to this finding, the trial court entered a memorandum order December 17, 1997, dismissing the complaint with prejudice pursuant to section 2—619 of the Code. 735 ILCS 5/2—619 (West 1996). The trial court denied plaintiff's motion for reconsideration, and plaintiff appeals.

## II. ANALYSIS

■ When faced with a motion to dismiss, the court must accept as true all well-pleaded factual allegations and disregard mere conclusions of law or conclusions of fact unsupported by specific allegations

of fact. *Capitol Indemnity Corp. v. Stewart Smith Intermediaries, Inc.*, 229 Ill. App. 3d 119, 123, 593 N.E.2d 872, 875 (1992); *Washington v. Chicago Board of Education*, 204 Ill. App. 3d 1091, 1094, 562 N.E.2d 541, 543 (1990).

## A. Contract Interpretation

Plaintiff first contends the trial court erred in dismissing the complaint pursuant to section 2—619 of the Code based on its finding the contract at issue was clear, unambiguous, and subject to no other reasonable interpretation than that the Agreement grants the city the right to provide electric service to the areas in dispute. Count II of defendant's motion to dismiss attacked plaintiff's complaint on the grounds the claim asserted was barred by an affirmative matter avoiding the legal effect of or defeating the claim. 735 ILCS 5/2—619(a)(9) (West 1996). The complaint sounded in breach of contract. The issue presented to the trial court was one of contract construction.

■ The standard of review on appeal from the granting of a motion to dismiss under section 2—619 of the Code is *de novo. Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116, 619 N.E.2d 732, 735 (1993). Upon review, the appellate court must evaluate whether the trial court ruled correctly in finding no genuine issue of material fact was raised and whether, as a matter of law, dismissal was proper. *Kedzie*, 156 Ill. 2d at 116-17, 619 N.E.2d at 735.

■ The purpose of involuntary dismissal of actions pursuant to section 2—619(a)(9) of the Code based on an affirmative matter is to provide a mechanism to dispose of issues of law or easily proved issues of fact at the outset of litigation. *Meyers v. Rockford Systems, Inc.*, 254 Ill. App. 3d 56, 61, 625 N.E.2d 916, 920 (1993). Since contract construction is a question of law for the court, an action may be dismissed under section 2—619 of the Code (735 ILCS 5/2—619 (West 1996)) based on the court's interpretation of the contract at issue. *Corluka v. Bridgford Foods of Illinois, Inc.*, 284 Ill. App. 3d 190, 195, 671 N.E.2d 814, 818 (1996).

In this case, plaintiff contends the trial court erred in dismissing its complaint. Specifically, plaintiff argues the Agreement is ambiguous on its face and the trial court failed to consider the Cooperative's interpretation of the contract based on the parties' intent and past practices.

Plaintiff's contention focuses on the interpretation of the language in paragraphs 1 through 3 of the Agreement and the boundary map attached thereto. The relevant provisions are as follows:

"1. The Cooperative agrees that in exchange for the covenants contained herein, that it will not contest the right of Sullivan to

provide electric service to the property referred to as the Elder Tract or the old Peadro Farm and specifically described in Appendix 'A' attached hereto. It is specifically understood and agreed *when any territory included in the aforesaid property is annexed* into the City of Sullivan, that if the customers who reside in the area annexed to the City of Sullivan desire to have electric service from the City of Sullivan that the Cooperative agrees that Sullivan has the legal right to provide such service and that the customers located therein have the legal right to take such service from Sullivan.

2. Sullivan and the Cooperative agree that as any other property located outside the City limits of Sullivan which becomes annexed into Sullivan that the City of Sullivan has the legal right to serve that territory once it is annexed into the City of Sullivan and that the customers whose property is annexed into Sullivan have the right to receive electric service from Sullivan.

3. Sullivan and the Cooperative have agreed as to the *existing service territories* as of the date of the execution of this Agreement and the map which is attached hereto as Appendix 'B' truly and accurately represents said *existing service areas*. Sullivan has no objection to the Cooperative providing service to the Hillard property so long as said property is not annexed to the City." (Emphasis added.)

A boundary map is attached to the Agreement, which shows the boundary line between the existing service territories of Sullivan and the Cooperative. The legend identifies the designated areas as the respective "existing service territories."

■ In interpreting a contract, meaning and effect must be given to every part of the contract including all its terms and provisions, so no part is rendered meaningless or surplusage unless absolutely necessary. *Martindell v. Lake Shore National Bank*, 15 Ill. 2d 272, 283, 154 N.E.2d 683, 689 (1958). A contract is to be construed as a whole, giving meaning and effect to every portion thereof, if possible, and not resorting to detached portions thereof standing alone. *Home & Automobile Insurance Co. v. Scharli*, 10 Ill. App. 3d 133, 136, 293 N.E.2d 914, 916 (1973). It is presumed the provisions are purposefully inserted and the language is not employed idly. *State Farm Mutual Automobile Insurance Co. v. Schmitt*, 94 Ill. App. 3d 1062, 1065, 419 N.E.2d 601, 603 (1981).

■ In interpreting the contract language, plaintiff argues the contract language is ambiguous. Therefore, parol evidence should be considered to ascertain the parties' intent with respect to the Agreement. As a general rule, when a contract provision is unambiguous, the court must give effect to the plain language of the provision and

cannot consider extrinsic evidence to determine whether the parties have intended another meaning. *Agribank, FCB v. Whitlock*, 251 Ill. App. 3d 299, 309, 621 N.E.2d 967, 974 (1993).

Plaintiff emphasizes the "annexation" language in paragraphs 1 through 3. In short, plaintiff argues it intended Sullivan be required to annex before servicing any areas outside the corporate boundaries, including those areas within Sullivan's designated "service territory." Plaintiff further argues the multiple references to annexation contained in the Agreement were intended to impose an annexation requirement upon Sullivan as demonstrated by the affidavit of John W. Dooley, which provides information as to the Cooperative's intent and past practices with Sullivan. Defendant interprets the agreement otherwise.

■ The trial court properly accepted defendant's interpretation as the clear and unambiguous meaning of the agreement and disregarded Dooley's affidavit as parol evidence. Defendant correctly explains the annexation language in both paragraphs 1 and 3 expressly requires annexation for specific tracts of property rather than the entire "existing service territory." Paragraph 1 discusses annexation only with respect to the "Elder Tract or the old Peadro Farm," not the entire "existing service territory" of Sullivan. Likewise, paragraph 3 plainly references annexation only with respect to a specifically described tract, the "Hillard property." Therefore, the annexation language of paragraphs 1 and 3 does not support plaintiff's assertions.

Plaintiff also points to the language of paragraph 2 that refers to annexation to support its claim. Plaintiff interprets this language to be mandatory in requiring annexation for any and all properties (other than the tract described in paragraph 1) for Sullivan to exercise its right to service these areas.

A cursory examination of paragraph 2, when read alone, may permit the implication the annexation language could have been intended to be mandatory, requiring annexation of all properties before Sullivan could service the properties. This interpretation, however, renders both paragraph 3 and the map of "existing service territories" superfluous. Paragraphs 1, 2, and 3 along with the map cannot be read together and be consistent using plaintiff's interpretation. Plaintiff argues paragraph 2 requires Sullivan to first annex property before electrical service is provided, including those properties designated as within Sullivan's "existing service area." If we accept plaintiff's interpretation, establishing an "existing service area" as outlined in paragraph 3 or creating the map attached to the Agreement would be unnecessary because all properties, regardless of their location, would be subject to the same annexation requirement.

In contrast to plaintiff's interpretation, defendant contends paragraph 2 can be given meaning, as well as other parts of the Agreement, as it can be interpreted as an acknowledgement of the state of the law with respect to Sullivan's right to serve newly annexed areas. Shortly before this Agreement was executed, Illinois law was unsettled as to whether a municipality could expand its existing service area through annexation. This question was resolved in the affirmative by *Central Illinois Light Co. v. City of Springfield*, 161 Ill. App. 3d 364, 367-68, 514 N.E.2d 602, 604 (1987). In *Central Illinois Light*, this court held municipalities have the legal right to serve any area annexed to the city.

Further, defendant's interpretation of paragraph 2 is consistent with paragraph 3, which identifies Sullivan's "existing service territory." Paragraph 3 and Appendix B specifically identify the *existing service territory* of Sullivan and the Cooperative. The plain and ordinary meaning of "exist," as defined by Black's Law Dictionary, is as follows: "[T]o be in present force, activity, or effect at a given time, as in speaking of 'existing' contracts, creditors, debts, laws, rights, or liens. To be or continue to be." Black's Law Dictionary 574 (6th ed. 1990).

The plain meaning of the term "exist" dictates that Sullivan possessed, at the time of the execution of the Agreement, the right to serve those areas *without* the need to take further or later action. Moreover, paragraph 3 does not require that the areas within the "existing service territory" be annexed before Sullivan has the right to serve them.

Based on the foregoing analysis, we find no error in the trial court's determination the Agreement is clear, unambiguous, and subject to no other reasonable interpretation than granting Sullivan the right to service, without annexation, the areas in dispute in counts I and II as they are located within Sullivan's "existing service territory."

## B. Electric Service Outside Corporate Boundaries

■ Next, plaintiff contends Sullivan does not have a legal right to provide electric service to the areas in dispute that are outside its corporate limits. The Illinois Municipal Code (65 ILCS 5/11—117—1 (West 1996)) controls this issue and provides in pertinent part:

"Subject to the provisions of this Division 117, any municipality may (1) acquire, construct, own and operate *within the corporate limits of the municipality* any public utility *the product or service of which, or a major portion thereof, is or is to be supplied to the municipality or its inhabitants* and may contract for, purchase and sell the product or service of any such utility ***." (Emphasis added.)

The language of this provision, which grants municipalities the power to own and operate electric utilities, has been consistently interpreted to mean a city has the right to sell electric power outside its corporate boundaries so long as the major portion thereof is supplied to the municipality or its inhabitants. See generally *Illinois Power Co. v. City of Jacksonville*, 18 Ill. 2d 618, 165 N.E.2d 300 (1960).

Consistent with this interpretation, defendant contends it has the legal right under the Illinois Municipal Code to serve customers both within and outside its corporate limits. Therefore, Sullivan has the legal right to serve the parcels at issue even though they are located outside the corporate boundaries. In contrast, plaintiff argues municipalities do not have the legal right to serve customers beyond corporate limits.

To understand rights of municipalities as provided in the Illinois Municipal Code (65 ILCS 5/11—117—1 (West 1996)), the historical evolution and judicial interpretation of the language in this provision is significant. The initial grant of power to municipalities to acquire, construct, own, and operate any public utility was first contained in the Municipal Ownership Act of 1913 (Ill. Rev. Stat. 1913, ch. 111a, par. 87), which provided as follows:

> "Be it enacted by the People of the State of Illinois, represented in the General Assembly: That any city in this State shall have the power, subject to the provisions of this act, to acquire, construct, own and operate any public utility *the product or service of which, or a major portion thereof, is or is to be supplied to the city or its inhabitants, and to contract for, purchase, and sell to private persons or corporations the product, or service of such utilities.*" (Emphasis added.)

As stated in *Jacksonville*, 18 Ill. 2d at 621, 165 N.E.2d at 302:

> "In first considering the granted authority, this court, in *Carr v. City of Athens*, 304 Ill. 212, [136 N.E. 633 (1922),] held that the city of Springfield could, by contract, sell the product of its public utility beyond its corporate limits. Thereafter, in the case of *People v. City of Chicago*, 349 Ill. 304, [182 N.E. 419 (1932),] it was held that a city was not limited in the acquisition of a public utility to one whose physical properties were located wholly within the corporate limits of such municipality."

We note *Carr* actually held only that the City of Athens could go outside its corporate limits to purchase needed supplies wherever they could be obtained to the best advantage:

> "Counsel for appellant also says that the contract of the city of Springfield to furnish electric current to the city of Athens is an illegal contract and cannot be enforced because the Municipal Ownership act, purporting to grant this power to the city of

Springfield, is unconstitutional and void. No provision of the constitution is mentioned in support of the argument, but the question is not involved and cannot be considered in this case because the city of Springfield is not a party and its right to enter into the contract cannot be determined. The city of Springfield established an electric power plant at the municipal waterworks stationed on the Sangamon river, north of and outside of the corporate limits of the city, and it is from this plant that an electric current is to be furnished to the city of Athens. The Springfield Gas and Electric Company, a private corporation engaged in the production and sale of electricity in the city of Springfield, filed its bill for an injunction against the city, charging that the Municipal Ownership act was void because in violation of constitutional rights. The bill was dismissed for want of equity and the decree was affirmed by this court. (*Springfield Gas and Electric Co. v. City of Springfield*, 292 Ill. 236[, 126 N.E.739 (1920)].) The act was there held to be free from constitutional objection so far as it was material to the issues in that case, but it was said that *the question whether or not the city could sell its product outside of the corporate limits was not involved and was not proper to be considered in that case*. By its contract with the city of Athens the city of Springfield has exerted the power claimed to be given by the Municipal Ownership act to sell electricity outside of the corporate limits, and its right to so dispose of electricity and to enter into the contract cannot be considered or decided in a case to which it is not a party and cannot be heard in defense of its right. *The only question which can be considered is whether the city of Athens has power to purchase electricity outside of its corporate limits* \*\*\*. \*\*\* It is essential to the existence of a local municipality that it shall have a certain and defined territory in which it may exercise its governmental powers, but whenever it is necessary, in the exercise of such powers, to go beyond the corporate limits it may do so with or without express authority, as in the case of obtaining water supply for fire protection and the use of its inhabitants, procuring an outlet for a sewer to promote the public health, or the establishment of a pest-house. That power has been exercised by the city of Springfield in the establishment of municipal waterworks and an electric power plant outside of the corporate limits of the city, and the like power has been exercised by very many municipal corporations and the right sustained. In its business relations a city is not confined, in the purchase of needed supplies, to the limits of the city but it may purchase them wherever they can be obtained to the best advantage. Wherever it is found essential to the exercise of corporate powers, a city may go outside of the corporation to accomplish that result." (Emphasis added.) *Carr*, 304 Ill. at 214-15, 136 N.E. at 633-34.

The language of the Municipal Ownership Act of 1913, quoted above and referenced in *Carr*, was later reenacted substantially unchanged in 1941 as section 49—1 of the Revised Cities and Villages Act (Ill. Rev. Stat. 1941, ch. 24, par. 49—1).

In 1955, the Revised Cities and Villages Act was amended and the phrase "within the corporate limits of the municipality" was inserted and is included in the Illinois Municipal Code in its present form, quoted above. See Ill. Rev. Stat. 1955, ch. 24, par. 49—1 (now 65 ILCS 5/11—117—1 (West 1996)). The meaning of this amendment was tested shortly thereafter in *Jacksonville*, 18 Ill. 2d 618, 165 N.E.2d 300.

In *Jacksonville*, the Illinois Power Company contended the insertion of the quoted material in 1955 manifested an intent to repudiate the holding in *Carr* and to restrict municipalities to the confines of their corporate boundaries. *Jacksonville*, 18 Ill. 2d at 622, 165 N.E.2d at 303. The court held such a construction would lead to an absurd result in that a municipality would be limited to its boundaries by one phrase and at the same time "permitted to supply persons outside the corporate limits by the balance of the language." *Jacksonville*, 18 Ill. 2d at 622, 165 N.E.2d at 303. The court further noted the only legislative limitation to the right of municipalities to sell outside corporate boundaries is that the major portion of the city-owned public utility product be supplied to the municipality or its inhabitants. *Jacksonville*, 18 Ill. 2d at 623, 165 N.E.2d at 303.

In reaching its decision, the court in *Jacksonville* acknowledged the fundamental rule of statutory construction that the court presumes the legislature knows of prior interpretations of statutory language pursuant to judicial decisions. Further, when a statute is amended those portions of the old law that are not repealed are regarded not as a new enactment but rather a continuation of the old law. *Jacksonville*, 18 Ill. 2d at 622, 165 N.E.2d at 303.

Using these same principles of statutory construction, the language of the Illinois Municipal Code in its present form retains the same meaning: municipalities have the authority to sell power outside their corporate boundaries subject to the limitation that a major portion of the electric product be supplied to the municipalities or their inhabitants. Thus, Sullivan does have the legal right to sell outside its corporate boundaries subject to the above-noted limitation and to the waiver provision added in 1972, which is discussed below. See 65 ILCS 5/11—117—1 (West 1996).

## C. Waiver

Plaintiff Cooperative further contends the trial court erred in

finding the Agreement constituted a written waiver within the meaning of section 11—117—1 of the Illinois Municipal Code. The finding of a waiver is significant because it indicates the Cooperative waived any entitlement to provide electrical service to the areas disputed in counts I and II, which in turn provides Sullivan with the right to service those disputed areas that lie outside its corporate limits but within the "existing service territory."

Plaintiff argues nothing contained in the Agreement can be reasonably interpreted as a waiver. Defendant contends there can be no clearer example of a written waiver than an agreement by the electric supplier, here the Cooperative, that certain areas are the "existing service territory" of Sullivan.

■ As discussed above, the Illinois Municipal Code permits Sullivan, a municipal corporation, to own and operate a municipal utility within its corporate limits. 65 ILCS 5/11—117—1 (West 1996). Further, in 1972, the Illinois Municipal Code was amended to its present form. Pub. Act 77—2465, § 1, eff. October 1, 1972 (1972 Ill. Laws 1467-68). This amendment added language that required municipalities to receive a written waiver before servicing a new customer whom an electric supplier was entitled to serve. Pursuant to this amendment, municipalities are also permitted to own and operate power lines or substations outside the corporate limits, but effective October 1, 1972, "no new customer which an electric supplier is entitled to serve under the Electric Supplier Act [(Ill. Rev. Stat. 1973, ch. 111²/₃, par. 401 *et seq.* (now 220 ILCS 30/1 *et seq.* (West 1996)))] may be served from any line, lines or other facilities located without the corporate limits of a municipality unless waiver to serve such a customer is given in writing by the electric supplier" (Ill. Rev. Stat. 1973, ch. 24, par. 11—117—1(2) (now 65 ILCS 5/11—117—1(2) (West 1996))).

■ "Waiver" is defined as "the intentional relinquishment of a known right." *Illinois Valley Electric Co-Operative, Inc. v. City of Princeton*, 229 Ill. App. 3d 631, 638, 594 N.E.2d 347, 352 (1992). Plaintiff argues the trial court did not specifically identify the part of the Agreement that constituted a waiver. However, logic dictates the trial court need not point to a specific phrase or word in the Agreement to properly find a waiver.

■ The Agreement, when read as whole, constitutes a waiver. The Agreement on its face in the third recital indicates it was intended to resolve territorial disputes between Sullivan and the Cooperative. The resolution of a territorial dispute necessarily suggests the concurrent assignment and waiver of rights. By assigning an "existing service territory" to Sullivan, the Cooperative concurrently relinquished or waived its rights with respect to that same territory.

We find no error in the trial court's determination the Agreement constitutes a waiver within the meaning of section 11—117—1.

### D. Illinois Commerce Commission Approval

Plaintiff's final contention on appeal is the agreement is void because the parties were required to secure the approval of the Illinois Commerce Commission (ICC) but failed to do so.

■ Defendant Sullivan argues plaintiff has waived any such argument, since plaintiff did not raise the issue of ICC approval until plaintiff's motion to reconsider. Defendant correctly contends it is not proper to raise a new legal theory or factual argument in a motion for rehearing. *Gardner v. Navistar International Transportation Corp.*, 213 Ill. App. 3d 242, 248-49, 571 N.E.2d 1107, 1111 (1991). Thus, waiver applies to the parties with respect to this legal issue. However, we elect to consider this issue on appeal and, in so doing, we find plaintiff's argument is without merit.

Plaintiff argues the Agreement is void for lack of ICC approval as required pursuant to the Electric Supplier Act (Act) (Ill. Rev. Stat. 1991, ch. 111²/₃, pars. 401 through 416 (now 220 ILCS 30/1 through 16 (West 1996)). Defendant Sullivan correctly argues it is not subject to the Act; therefore, the Agreement does not require ICC approval.

■ The Act requires "service area" agreements "between electric suppliers" be approved by the ICC. Ill. Rev. Stat. 1991, ch. 111²/₃, par. 406 (now 220 ILCS 30/6 (West 1996)). However, Sullivan is not an "electric supplier" within the meaning of the Act. Ill. Rev. Stat. 1991, ch. 24, par. 403.5 (now 220 ILCS 30/3.5 (West 1996)). Therefore, the Agreement in question is not a "service area" agreement within the meaning of the Act and is not required to have ICC approval.

Pursuant to section 6 of the Act:

> "Any 2 or more *electric suppliers* may contract together defining and delineating, as between themselves, one or more service areas in which each such contracting supplier shall be entitled to furnish service. Such contracts are subject to the approval of the [ICC]." (Emphasis added.) Ill. Rev. Stat. 1991, ch. 111²/₃, par. 406 (now 220 ILCS 30/6 (West 1996)).

The term "electric supplier" is defined as follows: " 'Electric Supplier' or 'Supplier' means an electric cooperative or a public utility which furnishes electric service." Ill. Rev. Stat. 1991, ch. 111²/₃, par. 403.5 (now 220 ILCS 30/3.5 (West 1996)). Sullivan, however, is neither an electric cooperative nor a public utility.

■ Section 3.4 of the Act defines the term "electric cooperative" to include:

> "(a) any *not-for-profit corporation* or other person that owns, controls, operates or manages, directly or indirectly, within this

State, any plant, equipment or property for the production, transmission, sale, delivery or furnishing of electricity and (b) that either is or has been financed in whole or in part under the federal 'Rural Electrification Act of 1936' and the Acts amendatory thereof and supplementary thereto, or is directly or indirectly caused to be formed by any one or more such not-for-profit corporations or other persons that is or has been so financed." (Emphasis added.) Ill. Rev. Stat. 1991, ch. 111²/₃, par. 403.4 (now 220 ILCS 30/3.4 (West 1996)).

Based on the term "electric cooperative" as defined in the Act, Sullivan is not an electric cooperative.

The Electric Supplier Act defines a "public utility" as having "the same meaning as is defined in Section 10.3 of the Public Utilities Act." Ill. Rev. Stat. 1991, ch. 111²/₃, par. 403.14 (now 220 ILCS 30/3.14 (West 1996)). Section 3—105 of the Public Utilities Act (formerly section 10.3) (Ill. Rev. Stat. 1991, ch. 111²/₃, par. 3—105 (now 220 ILCS 5/3—105 (West 1996))) defines "public utility" and provides in pertinent part:

" 'Public Utility' does not include however:

1. public utilities that are owned and operated by any political subdivision, public institution of higher education or municipal corporation of this State, or public utilities that are owned by such political subdivision, public institution of higher education, or municipal corporation and operated by any of its lessees or operating agents ***."

Thus, Sullivan, a municipal corporation, is expressly excluded from the definition of a public utility, removing it from the purview of the Act.

Equally important, the Act expressly provides: "Nothing in this Act shall be construed to impair, abridge, or diminish in any way the powers, rights and privileges of incorporated municipalities." Ill. Rev. Stat. 1991, ch. 111²/₃, par. 414 (now 220 ILCS 30/14 (West 1996)).

In sum, ICC approval is not required because the Agreement reached between the Cooperative and Sullivan does not fall within the scope of the Act as Sullivan, a municipal corporation, is not an electrical supplier within the meaning of the Act.

Based on the preceding analysis, we find (1) the Agreement is clear and unambiguous on its face; (2) the Illinois Municipal Code gives Sullivan the legal right to provide electric service outside its corporate boundaries with a waiver from the electric supplier; (3) the Agreement constitutes a waiver within the meaning of the Illinois Municipal Code; and (4) the Agreement is not void for lack of ICC ap-

proval. For the foregoing reasons, we hold dismissal herein was proper as a matter of law.

Affirmed.

McCULLOUGH, J., concurs.

JUSTICE COOK, specially concurring:

The Agreement between Sullivan and the Cooperative does a number of things. It recognizes that Sullivan has the power to provide service outside the existing city limits, it resolves a dispute as to the Elder Tract and provides compensation for the Cooperative's assets there, and it establishes a method for resolving future disputes as to other areas and providing compensation for the Cooperative. The Agreement in several places refers to annexation. Some portions of the Agreement, such as paragraph 5, use annexation as the point in time at which the turnover of service becomes effective and the right to compensation comes into being. The Agreement does not mention that a city has some ability to supply electric power outside its boundaries without annexing the area to which power is supplied. See *Jacksonville*, 18 Ill. 2d 618, 165 N.E.2d 300. Absent clear language I do not read the Agreement as requiring Sullivan to proceed by way of annexation and prohibiting Sullivan from using other legitimate methods to supply power outside its boundaries. There is no indication in the Agreement that it makes any difference to the Cooperative which method Sullivan uses, and the reference to annexation is simply a reference to Sullivan's decision to begin supplying power, however that decision is carried out.

An important part of the Agreement, for purposes of this case, is paragraph 5. That paragraph provides that when Sullivan annexes territory in the future it will enter into negotiations to purchase the Cooperative's facilities, "if that territory had been within the service territory of the Cooperative." Apparently there is no obligation to purchase facilities that are within the service territory of Sullivan, as shown on Appendix B. Apparently at the time of the Agreement the Cooperative did not have much in the way of facilities in what was designated as Sullivan's existing service territory. If the Cooperative has no right to compensation for its facilities, what difference does it make to the Cooperative whether Sullivan proceeds by way of annexation or by some other method?

Paragraph 3 of the Agreement provides that the parties have agreed to their existing service areas as of the date of the Agreement, as shown on Appendix B. I would be willing to listen to any evidence

that Appendix B was not accurate and that the Cooperative actually was furnishing service to some areas listed as being within Sullivan's service area. I agree with the trial court, however, that affidavits by the Cooperative's employees that the Agreement simply was not in accordance with the parties' intent are inadmissible. It does not appear that the Cooperative was furnishing service either to what is now to be Schable Acres Subdivision, or to the property in the northeast quarter of section 23. At most it appears that no one was furnishing power to those areas, and perhaps that was why the Cooperative had no objection to those areas being included within Sullivan's service area.

The Cooperative has recognized Sullivan's right to furnish power to Schable Acres and to the property in the northeast quarter of section 23. The Cooperative apparently has no facilities in those areas, and the Agreement makes it clear the Cooperative is not entitled to any compensation for facilities in those areas. What complaint does the Cooperative have if Sullivan chooses to supply power to those areas without annexation, if it is able to do so in some other manner? I do not read the Agreement to allow the Cooperative to insist upon annexation in this case. It appears the Cooperative is relying upon a technicality to avoid complying with its agreement now that significant service to these areas will be required.