No. 2--02--0748

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

DEAN MANAGEMENT, INC., ) Appeal from the Circuit Court

) of Du Page County.

Plaintiff and )

Counterdefendant- )

Appellant, )

)

v.                )  No. 01--AR--58

) 

TBS CONSTRUCTION, INC., )

)

Defendant and ) Honorable

Counterplaintiff- ) Kenneth Moy,

Appellee. ) Judge, Presiding.

________________________________________________________________

JUSTICE BYRNE delivered the opinion of the court:

This breach of contract case arises out of a construction agreement between the general contractor, plaintiff, Dean Management, Inc., and a subcontractor, defendant, TBS Construction, Inc.  Plaintiff terminated the contract and filed a verified complaint seeking damages, interest, and attorney fees and costs.  Defendant filed a counterclaim for past-due payments under the contract.  The trial court denied each party relief, finding that (1) plaintiff had not properly served defendant with notice of its intent to terminate the contract and (2) defendant failed to prove that it was entitled to additional payment.  On appeal, plaintiff contends that the trial court erroneously (1) concluded that the contract prohibited plaintiff from serving defendant with notice by facsimile transmission and (2) found that the defendant never actually received notice.  Rather than challenging the portion of the judgment denying its claim for past-due payments, defendant merely asserts that we should affirm the judgment.  We agree with both of plaintiff's arguments, and we reverse the judgment and remand the cause with directions.

FACTS

The following facts are undisputed.  Plaintiff is a Wisconsin corporation engaged in the business of general contracting and construction.  Defendant is an Illinois corporation engaged in the business of excavation and concrete installation.  On December 22, 1999, the parties entered into a written subcontract agreement (the contract) pursuant to which plaintiff agreed to pay $158,293 for defendant to excavate and install concrete and site utilities at a construction project commonly known as the Lion's Choice Restaurant in Warrenville.  Article 5 of the contract permitted plaintiff to terminate the contract and provides in relevant part:

"Should [defendant] fail to perform his obligation hereunder, including but not limited to, failure to pursue completion of said work with due diligence, [plaintiff] may terminate this Subcontract by written notice to [defendant] from [plaintiff].  The determination as to whether [defendant] is pursuing completion of the work with due diligence shall be made solely by [plaintiff] or it's [
sic
] representative.

In the event of termination, as herein provided, [defendant] will be paid for all work satisfactorily completed to the date of termination; provided, however, that [plaintiff] may withhold sufficient amounts from any such payment to cover any loss which [plaintiff] any [
sic
] suffer as a result of the failure of [defendant] to satisfactorily fulfill his obligations hereunder.  Acceptance of payment upon termination by [defendant] shall waive and [
sic
] further rights of defendant against [plaintiff] or Owner.  Nothing herein shall limit [plaintiff's] rights to damages as a result of [defendant's] failure to fulfill his obligation hereunder.  The parties agree that, in the event [defendant] fails to complete the Subcontracted work according to the schedule herein provided, the damages suffered by [plaintiff], as a result of such delay, would be difficult to ascertain, and the parties thereby agree that, in the event of failure of [defendant] to complete said work within the time period herein provided, [defendant] shall pay [plaintiff] liquidated damages in the amount of One Hundred and No/100 ($100.00) dollars for each day beyond the scheduled completion date.  
In the event [plaintiff] has to take over [defendant's] job and terminate the Contract, said [plaintiff] shall give a twenty-four (24) hours written notice prior to it's taking over the job.
 [Defendant] is responsible for differences between Subcontract Agreement price and completed price."  (Emphasis added.)

During January 2000, defendant completed certain work under the contract.  On March 2, 2000, representatives of an electrical workers union began picketing the site because plaintiff had employed a nonunion electrical subcontractor.  Plaintiff instituted a gating system whereby it designated both a reserve gate where picketing was allowed and a neutral gate where picketing was not allowed.  On March 3, 2000, plaintiff sent defendant a facsimile transmission (fax) notifying it about the establishment of the gating system at the site.  Citing the presence of the picketers, defendant removed its equipment and employees from the site and refused to perform additional work pursuant to the contract.

At 5:27 p.m. on March 9, 2000, Timothy Nolan, plaintiff's attorney, sent a fax on his law firm's letterhead to "Russ" at defendant's place of business.  The fax stated that plaintiff would take over the project if defendant did not resume performance under the contract within 24 hours of receiving the notice.  Nolan included a "Fax Transmittal Sheet," identifying the date, the intended recipient, the fax numbers of the source and destination machines, and the number of pages in the transmission.  Nolan's fax machine generated a "transmission report," which indicated the date and time of the transmission, the duration of the call, and verification that the fax was received.  The following morning, defendant resumed working at the site.  Later that afternoon, Nolan arranged for personal delivery of a copy of the notice via messenger.  The messenger signed and dated a statement of delivery, and his signature was notarized.  Defendant concedes that "[t]here can be no doubt that [defendant] received the document."

In late March or early April 2000, the presence of picketers again caused defendant to remove its equipment and employees from the site.  The appellate record contains a copy of a letter on plaintiff's letterhead that was prepared by Dustin Dostal, plaintiff's project manager.  Like Nolan's fax, Dostal's letter was addressed to Russ at defendant's place of business and stated that plaintiff would assume control of defendant's project and terminate the contract if defendant did not return to the site within 24 hours.  Dostal's letter contained the following notation: "VIA FACSIMILE TRANSMISSION DATED MARCH 30, 2000 AND VIA MESSENGER DELIVERY ON MARCH 31, 2000."  The exhibit in the record does not include a fax transmittal sheet like the one attached to Nolan's fax.  However, Dostal dated the letter April 7, 2000, and the top margin contains a fax transmittal code indicating that the letter was sent from plaintiff's fax machine at 8:35 a.m. on April 7, 2000, and that the letter was the second page of the transmission.

James Kehm, plaintiff's site supervisor, testified that, on the morning of April 7, 2000, Steven Snow, one of defendant's employees, arrived at the site and began loading dirt into waiting trucks.  Union picketers were on site and had set up informational picketing directed to plaintiff's use of nonunion electrical, heating, and air subcontractors.  Plaintiff's two-gate system was  operating that morning.

Kehm stated that, at approximately 8 a.m., the business agent from Snow's union arrived and instructed Snow to leave the site.  Snow and the agent left, and Kehm telephoned Dostal and told him that defendant's operator had abandoned the project.  Snow returned 5 or 10 minutes later.  At approximately 8:30 a.m., Kehm spoke with Snow's supervisor, Don Brummerstedt, who stated that the union had demanded that defendant "pull off [the project] and not come back."  Snow again left with the agent, and Kehm did not authorize him to do so.  Kehm reported Snow's absence to Dostal, who instructed Kehm to locate replacement subcontractors who could complete defendant's project.

Dostal corroborated Kehm's testimony at trial.  Immediately after learning that Snow had left the site, Dostal directed his secretary to send the "24-hour demand letter" by fax, but he never sent a copy of the notice via messenger.  Dostal did not authorize defendant to leave the site on April 7, 2000, or on any other day.  No employee of defendant ever responded to the April 7 fax.

Snow testified that he was ready, willing, and able to work on April 7, 2000, and that he started loading dirt onto trucks that morning.  Snow confirmed that his union business agent arrived and inquired why Snow was working while picketers were present.  Snow left the site temporarily with the agent, and when they returned, Snow telephoned Don Brummerstedt, who told him to cease working.  Snow's time records indicate that he left the site at 8:15 a.m.  Snow admitted that much of defendant's excavation work had not yet been completed at the time he left the project.

Tim Brummerstedt, defendant's president, initially acknowledged at trial that he might have actually received the April 7, 2000, notice twice.  Brummerstedt then changed his testimony, insisting that he first learned of the fax after plaintiff filed its suit.  Plaintiff's counsel impeached Brummerstedt with his prior deposition testimony in which he stated that he received the fax on or about April 7 and "assumed [plaintiff] [was] going to take over performance of the job" at that time.  During the deposition, Brummerstedt conceded that he did not direct any worker to return to the site after April 7 because defendant "couldn't move the equipment back in 24 hours, so there was no sense in trying."

After concluding that defendant would not return to the project, plaintiff hired other subcontractors and suppliers to complete the subcontracting work.  On January 9, 2001, plaintiff filed a verified complaint alleging breach of contract and seeking $28,293 in damages plus statutory interest, attorney fees, and costs.  Defendant filed an answer, two affirmative defenses, and a counterclaim seeking $14,933 for work completed before plaintiff terminated the contract.  None of defendant's pleadings alleged that plaintiff had delivered inadequate notice of its intent to take over the project and terminate the contract.

The trial court entered its memorandum opinion and order on June 24, 2002.  The court initially concluded as a matter of law that any notice to terminate the contract that plaintiff might have sent defendant by fax would have been ineffective because the parties did not stipulate in the agreement that they could serve one another written notice by fax.  The court also found that "the April 7, 2000, 24-hour notice by fax was claimed to never have been received by the Defendant.  Therefore, there was no 
actual
 notice.  Since facsimile was not an agreed method of service, there was no service given.  The plaintiff would not be entitled to damages because there was no breach of the contract."  (Emphasis in original.)

The court ruled that, because plaintiff failed to provide adequate notice of its intent to terminate the contract, plaintiff had breached the contract and was not entitled to damages, attorney fees and costs, or interest.  Finally, the court held that defendant failed to present sufficient evidence to support its claim for $14,933 in past-due payments under the contract.  Plaintiff timely filed a notice of appeal on July 19, 2002.

ANALYSIS

On appeal, plaintiff argues that the trial court erred when it (1) concluded as a matter of law that the contract barred written notice by fax and (2) found that defendant did not, in fact, receive written notice of plaintiff's intent to terminate the contract on April 7, 2000.

When the language of a contract is clear and unambiguous,  construction of the contract is a matter of law that is subject to 
de
 
novo
 review.  A court must construe the meaning of a contract by examining the language and may not interpret the contract in a way contrary to the plain and obvious meaning of its terms.  Unless the contract clearly defines its terms, the court must give the contractual language its common and generally accepted meaning.  Furthermore, the court must place the meanings of words within the context of the contract as a whole.  A contract term is ambiguous when it may reasonably be interpreted in more than one way.  The mere fact that the parties disagree on some term, however, does not render the term ambiguous.  
J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.
, 194 Ill. App. 3d 744, 748 (1990).  "A court will neither add language or matters to a contract about which the instrument itself is silent, nor add words or terms to an agreement to change the plain meaning of the parties as expressed in the agreement."  
Sheehy v. Sheehy
, 299 Ill. App. 3d 996, 1001 (1998).

If the language of the contract is facially unambiguous, then the "four corners" rule requires the trial court to interpret the contract as a matter of law without the use of parol evidence.  If, however, the language of the contract is susceptible to more than one meaning, then an ambiguity is present and parol evidence may be admitted to aid the trier of fact in resolving the ambiguity.  
Air Safety, Inc. v. Teachers Realty Corp.
, 185 Ill. 2d 457, 462-63 (1999).

In this case, Article 5 of the contract provides that plaintiff had the right to terminate the contract under certain circumstances by giving 24 hours' "written notice."  Because the contract does not define "written notice," we must give the term its common and generally accepted meaning.  See 
J.M. Beals
, 194 Ill. App. 3d at 748.  It is clear that a letter sent by fax is a "writing" as that term is commonly defined.  Furthermore, Dostal's letter expressed plaintiff's intent to terminate the contract and take over the project if defendant did not return to the site within 24 hours.  Therefore, we conclude that the unambiguous plain meaning of "written notice" under Article 5 of the contract includes fax transmissions like the one purportedly sent by Dostal.

The contract is silent on the method of delivering the notice, and the trial court construed this silence as barring plaintiff from using a fax machine.  In reaching its conclusion, the trial court relied upon 
Denis F. McKenna Co. v. Smith
, 302 Ill. App. 3d 28 (1998).  In 
McKenna
, the defendant agreed to sell the plaintiff a parcel of real estate.  The contract permitted the defendant's counsel to reject the sale as long as notice of the rejection was "in writing," addressed to the plaintiff, and delivered by personal delivery, certified or registered mail, or facsimile transmission.  
McKenna
, 302 Ill. App. 3d at 30.  The defendant's counsel faxed his rejection to the plaintiff's broker rather than to the plaintiff, but the notice was forwarded to the plaintiff.  The defendant negotiated a more favorable contract with another buyer, and the plaintiff sued to invalidate the second transaction.  The trial court ruled for the defendant after concluding that the plaintiff received actual notice of the rejection.  
McKenna
, 302 Ill. App. 3d at 31.

The plaintiff appealed, and the appellate court held that, although service of the notice of rejection on the broker was a technical breach of the contract, the breach was immaterial under the principles of inherent justice.  
McKenna
, 302 Ill. App. 3d at 32.  The court further concluded that the actual notice was sufficient because the purpose of a contractual notice provision is to ensure that notice is delivered.  The court declined to invalidate the defendant's second contract because the plaintiff had actually received the notice of rejection on the day the defendant sent it to the broker.  
McKenna
, 302 Ill. App. 3d at 31.

In this case, the trial court misinterpreted 
McKenna
 to hold that a party may not send a notice by fax if the contract does not expressly provide for that particular method of written communication.  In 
McKenna
, the parties elected to define the acceptable methods of delivering written notice.  However, the parties' failure to expressly designate delivery by fax as an acceptable method of written communication in this case does not render plaintiff's notice ineffective because the plain meaning of the term "written notice" encompasses faxes.  Therefore, we conclude that the trial court erroneously ruled as a matter of law that plaintiff was barred from sending its notice by fax.

Defendant insists that the term "written notice" is ambiguous and that therefore, we must consider parol evidence to determine the parties' intent.  It appears that the trial court considered parol evidence and relied upon Supreme Court Rule 11(b)(4) (145 Ill. 2d R. 11(b)(4)) in interpreting the contract.  Rule 11(b) contemplates personal, substituted personal, mail, or facsimile service of certain pleadings.  145 Ill. 2d R. 11(b); 
Lewis v. Collinsville Unit No. 10 School District
, 311 Ill. App. 3d 1021, 1028 (2000).  Under Rule 11(b)(4), papers served by transmitting them via facsimile must be sent to the office of the attorney or party who has consented to receiving service by facsimile transmission.  A party or attorney electing to serve pleadings by facsimile must include the telephone number of the sender's facsimile transmitting device on the certificate of service transmitted.  Use of service by facsimile shall be deemed consent by that party or attorney to receive service by facsimile transmission.  145 Ill. 2d R. 11(b)(4).

Here, the trial court concluded that, because there was no evidence that defendant ever sent plaintiff a fax in the course of the parties' performance, defendant did not consent to receiving plaintiff's notice by fax.  However, the contract does not mention Rule 11(b)(4), and we conclude that the plain meaning of the broad term "written notice" left the parties free to use any method for delivering written notice under Article 5 of the contract.  In applying Rule 11(b)(4) to the issue of whether plaintiff could fax notice of its intent to terminate the contract, the trial court erroneously added a limitation to the contract about which the instrument was silent.  See 
Sheehy
, 299 Ill. App. 3d at 1001.

Even if we were to conclude that the contract is ambiguous, the parties' conduct indicates that they contemplated the use of fax machines for written communication in this instance.  "A custom or usage becomes binding upon parties if it has been uniformly acquiesced in and applied by the parties for such a period of time so as to indicate that the custom was contemplated by the parties at the time formation of the contract was undertaken.  A custom or usage should be established by the testimony of several witnesses."  
Ledbetter v. Crudup
, 114 Ill. App. 3d 401, 403 (1983).

The undisputed evidence shows that the parties communicated by fax at least twice in their course of performance before April 7, 2000.  For example, defendant removed its employees and equipment from the site early in March 2000, and on March 9, plaintiff's counsel sent a fax demanding that defendant return to the site within 24 hours.  Frank Thiel, one of defendant's project managers, admitted at trial that he received the notice on March 10 and directed his employees to resume working that morning.  Plaintiff also sent defendant a copy of the notice by personal delivery on March 10, but it appears that the March 9 fax was effective because the notice sent by personal delivery arrived 
after
 defendant resumed working.  Although the occasional use of faxes does not suggest that the parties contemplated their use for all correspondence, the undisputed facts reveal that defendant acquiesced in that particular method of receiving "written notice" under Article 5 of the contract.

After concluding that the contract authorized plaintiff to send its notice by fax, we next address whether the evidence supports the trial court's finding that defendant did not actually receive plaintiff's notice to terminate the contract.  Plaintiff contends that defendant admitted in its answer that it received actual notice of plaintiff's intent to terminate the contract on April 7, 2000.  Defendant's answer contained numbered paragraphs that addressed the corresponding numbered paragraphs in the complaint.  For instance, in paragraph 9 of the answer, defendant stated, "[t]he Defendant admits the allegations contained in Paragraph #9 of the Plaintiff's Complaint."

Paragraph 10 of the complaint alleged that "[o]n or about April 7, 2000, [plaintiff] served [defendant] a second demand letter in accordance with Article 5 of the parties' Subcontract Agreement calling for [defendant] to resume its performance under the Subcontract Agreement."  In response, defendant stated in paragraph 10 of the answer that "[t]he Defendant admits the allegations contained in Paragraph #9 [
sic
] of the Plaintiff's Complaint."

The parties agree that paragraph 10 of the answer represents a scrivener's error.  Plaintiff argues that defendant intended to admit the allegations of paragraph 10 of the complaint rather than restate its admission to paragraph 9 of the complaint.  Defendant responds that it never intended to answer paragraph 10 of the complaint and that the statement should be ignored.

A judicial admission is a party's deliberate, clear, unequivocal statement about a concrete fact within the party's peculiar knowledge.  It is well settled that the party making the admission is bound by that admission and cannot contradict it.  
Eidson v. Audrey's CTL, Inc.
, 251 Ill. App. 3d 193, 195-96 (1993).  In this case, paragraph 10 of the answer is neither deliberate nor clear.  Under these circumstances, the trial court did not err in finding that defendant did not admit in the answer that it received plaintiff's notice on April 7, 2000.

Plaintiff next argues that the remaining evidence, particularly Tim Brummerstedt's deposition testimony, indicates that defendant actually received the notice.  The supreme court case of 
Bazydlo v. Volant
 sets forth the well-settled standard of review that applies here, and provides in pertinent part:

"A reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the fact finder.  The trial judge, as the trier of fact, is in a position superior to a reviewing court to observe witnesses while testifying, to judge their credibility, and to determine the weight their testimony should receive.  Consequently, where the testimony is conflicting in a bench trial, the trial court's findings will not be disturbed unless they are against the manifest weight of the evidence. [Citation.] A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence."  
Bazydlo v. Volant
, 164 Ill. 2d 207, 214-15 (1995).

" ' "There may be cases in which admissions at pre-trial depositions are so deliberate, detailed, and unequivocal, as to matters within the party's personal knowledge, that they will conclusively bind the party-deponent, and he will not be heard to contradict the admissions at the trial" (
Haskell v. Siegmund
 (1960), 28 Ill. App. 2d 1, 170 N.E.2d 393).' " 
Lindenmier v. City of Rockford
, 156 Ill. App. 3d 76, 87 (1987), quoting 
Young v. Pease
, 140 Ill. App. 3d 720, 723 (1986).

Although one part of Dostal's letter incorrectly indicates that he sent the fax on March 30, 2000, the letter is dated April 7, 2000, and the top margin contains a fax transmittal code indicating that the letter was sent from plaintiff's fax machine at 8:35 a.m. on April 7, 2000.  The exhibit corroborates Dostal's testimony regarding the transmission of the notice.

Moreover, it appears that defendant created its theory of inadequate notice as an afterthought on the eve of trial when the significance of the issue became apparent.  Tim Brummerstedt, defendant's president, admitted during his October 16, 2001, deposition that he received Dostal's April 7, 2000, notice and that he consciously decided to abandon the project.  Also, defendant filed two affirmative defenses at the start of the case and neither alleged that plaintiff did not deliver notice of its intent to take over the project and terminate the contract.  Brummerstedt's pretrial admission and defendant's failure to raise the notice issue in its pleadings indicate that Brummerstedt's denials at trial were self-serving and disingenuous. The trial court's finding that "there was no actual notice" was against the manifest weight of the evidence.

We conclude that the trial court erred in ruling that the contract barred plaintiff from faxing its notice to terminate the contract.  We further conclude that the court's finding that defendant did not receive the notice was manifestly erroneous.  Therefore, we reverse the trial court's judgment and remand the cause for the trial court to determine plaintiff's right to damages, attorney fees and costs, and statutory interest as requested in the complaint.

For the preceding reasons, the judgment of the circuit court of Du Page County is reversed and the cause is remanded with directions.

Reversed and remanded with directions.

GROMETER and GILLERAN JOHNSON, JJ., concur.