In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1359

INEOS POLYMERS INCORPORATED,

*Plaintiff-Appellant,*

*v.*

BASF CATALYSTS and BASF
AKTIENGESELLSCH,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:07-cv-02817—**Milton I. Shadur,** *Judge.*

ARGUED OCTOBER 21, 2008—DECIDED JANUARY 13, 2009

Before RIPPLE, EVANS and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* INEOS Polymers Incorporated
("INEOS Polymers") brought this action against BASF
Catalysts and BASF Aktiengesellsch ("BASF AG") for
breach of contract and tortious interference with con-
tractual rights. The district court dismissed the com-
plaint with prejudice, and INEOS Polymers appealed. For
the reasons set forth in this opinion, we now reverse the
judgment of the district court and remand for further
proceedings.

# I

# BACKGROUND

## A. Facts

### 1. The Supply Agreement

In 1992, Amoco Chemical Company, a subsidiary of Amoco Corporation, outsourced the production of its polypropylene catalyst, known as "CD-Catalyst," to Catalyst Resources, Inc. ("CRI"), a company owned by Phillips Petroleum Company ("Phillips"). The agreement reached between Amoco Chemical and CRI was embodied in a long-term supply agreement ("Supply Agreement"). According to the terms of the Supply Agreement, CRI agreed to build a production facility in Texas, and Amoco Chemical agreed to pay the cost of the facility over the course of a ten-year period through its purchasing commitments.

The detailed Supply Agreement is over one hundred pages long and includes terms for production and pricing, as well as more general contractual terms. The dispute in this case centers on the interpretation of Articles 17 and 19 of the contract. Article 17, entitled "The Right of First Refusal Clause," states in relevant part:

> 17.A. During the term of this Agreement, neither CRI nor Phillips, which indirectly wholly owns CRI, shall sell, transfer, assign, grant any option with respect to, merge, or otherwise dispose of any of the ownership or control of CRI, or any part of the Plant or of the Plant Site, or allow any of the foregoing to occur, unless: (i) CRI or Phillips has received a bona fide arm's-length offer to transfer the entire ownership or control of CRI,

or to transfer the ownership or control of certain assets of CRI, which assets include but are not limited to the entirety of the Plant and the Plant Site, to such party or parties; (ii) CRI or Phillips has determined that it is willing to accept such offer; (iii) CRI or Phillips has notified Amoco, in writing, of the terms and conditions of such offer; (iv) CRI or Phillips has first afforded Amoco the option to buy all of CRI or to buy all of the certain assets of CRI, which assets include but are not limited to the entirety of the Plant and the Plant Site, whichever is applicable, on terms and conditions no less favorable to Amoco than those contained in the offer; and (v) Amoco does not exercise its option to buy all of CRI or to buy all of the certain assets, which assets include but are not limited to the entirety of the Plant and the Plant Site, whichever is applicable, on such terms and conditions within ninety (90) days of receipt of the written notification referred to in (iii) above.

R.50-2, Ex. A at 95-96. Article 17.B. goes on to state that the right of first refusal does not apply to transfers of ownership to any company wholly owned by Phillips. Article 17.C. provides that, in the event that Amoco fails to exercise its option, and CRI completes the transaction, the transferee in those circumstances would continue to be bound by the Supply Agreement, including specifically Article 17.A. *See id.* at 96-97.

Also at issue is one of the "General Provisions" of Article 19, specifically Article 19.A., concerning "Assignment":

Assignment. Neither party may assign this Agreement, or any part thereof, without the prior written

consent of the other, except that Amoco may assign this Agreement in its entirety only without the consent of CRI at any time to an entity owned fifty percent (50%) or more, directly or indirectly, by Amoco Corporation, and CRI may assign this Agreement in its entirety only without the consent of Amoco to any company one hundred percent (100%) owned, directly or indirectly, by Phillips. Any other attempted assignment without the other party's consent shall be void. The terms of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted delegatees and assignees.

*Id.* at 100.

## 2. Corporate Changes

Over the years since the Supply Agreement was entered, each party has undergone a number of corporate mergers, restructurings or changes in ownership, which are crucial to understanding the parties' claims in this appeal. The corporate evolution of both parties is set forth below.

In 1995, Amoco Chemical assigned its rights and duties under the Supply Agreement to Amoco Polymers.[1] On December 31, 1998, Amoco Corporation, the parent of Amoco Chemical and indirect parent of Amoco Polymers, merged with a subsidiary of The British Petroleum Com-

---

[1] There is no suggestion in the record that CRI objected to this action as an impermissible assignment under Article 19.A.

pany p.l.c. ("BP"). The merged entity was renamed BP Amoco Corporation. Subsequent to this merger, Amoco Polymers was renamed BP Amoco Polymers, Inc.[2]

In 2005, BP announced a corporate reorganization of its petrochemical and refining business. Pursuant to this reorganization, on March 31, 2005, the shares of BP Amoco Polymers were transferred to a newly formed limited liability company, indirectly owned by BP, called O & D USA LLC. On May 24, 2005, O & D USA LLC was renamed Innovene USA LLC, and BP Amoco Polymers was renamed Innovene Polymers, Inc. Later that same year, INEOS US Intermediate Holding Company LLC acquired Innovene LLC, the parent company of both Innovene USA LLC and Innovene Polymers. On May 31, 2006, the entities changed their names to INEOS USA LLC and INEOS Polymers, Inc., respectively.

On the CRI side of the transaction, in 1994, Mallinckrodt purchased CRI, including the plant and CRI's rights and obligations under the Supply Agreement. By letters dated October 13, 1993, and December 17, 1993, Amoco waived its right of first refusal under Article 17 with respect to the purchase of CRI by Mallinckrodt. In 1998, another company, Engelhard purchased CRI's assets from Mallinckrodt; again, Amoco Polymers waived its right of first refusal.[3] In 1999, and again in 2005, Engelhard

---

[2] The successor to CRI did not object to this merger as violative of Article 19.A.

[3] Specifically, the letter dated March 24, 1998, stated:

   1. Upon Amoco's receipt of a fully executed copy of this

(continued...)

entered into a sale/leaseback transaction first with Chase Equipment Leasing, Inc., and later with Key Corporate Capital, that involved assets subject to Article 17; with respect to both of those transactions, Amoco waived its right of first refusal. *See* R.50-2, Exs. C & D. In June 2006, BASF AG "announced the completion of an acquisition whereby Engelhard became a wholly owned subsidiary of BASF AG and was subsequently renamed and converted to BASF Catalysts." R.50-2, ¶ 40.[4]

The corporate evolution of the parties to the Supply Agreement, set forth above, are embodied in the following chart:

---

[3] (...continued)

letter, Amoco will be deemed to have waived its rights of first refusal under Article 17 of the Agreement only for the transaction proposed in the February 23, 1998 letter of intent between Mallinckrodt and Engelhard (the "Letter of Intent"), provided that the transaction set forth in the Letter of Intent is consummated by December 31, 1998. Article 17 of the Agreement shall remain in full force and effect and apply to all other transfers described in Article 17 and shall apply to any sale or transfer by Mallinckrodt to Engelhard of assets covered by Article 17 if such occurs after December 31, 1998.

R.50-2, Ex. B. The letter made no mention of Article 19.A.

[4] Prior to this transaction, BASF AG, through a wholly owned subsidiary had attempted a hostile takeover of Engelhard. Specifically, it had made an all-cash proposal to acquire all outstanding common stock. The board of Engelhard initially rejected the offers and proposals of BASF AG; however, on May 29, 2006, the board approved a merger agreement.

Supply Agreement: History of the Parties



| Date | BASF Catalysts | INEOS Polymers | Transaction/Event |
|---|---|---|---|
| 1992 | CRI | Amoco Chemical | Original supply agreement |
| 1994 | Mallinckrodt | | Mallinckrodt buys CRI in stock purchases |
| 1995 | | Amoco Polymers, Inc. | Permitted assignment to Amoco Polymers, Inc. |
| 1998 | Engelhard | | Engelhard buys CRI assets from Mallinkrodt |
| 1998/ 1999 | | BP Amoco Polymers, Inc. | 1999 name change following 1998 Amoco Corp. merger into BP subsidiary |
| 2005 | | Innovene Polymers, Inc. | Name change following BP internal reorganization |
| 2005/ 2006 | | INEOS Polymers, Inc. | 2006 name change following 2005 INEOS Holding acquisition of Innovene Polymers indirect parent |
| 2006 | BASF Catalyst LLC | | Engelhard merges into BASF AG subsidiary |

Appellant's Br. at 12 (footnote omitted).

When INEOS Polymers became aware of the Engelhard-BASF AG transaction, it informed Engelhard and BASF Catalysts that it believed that the change of ownership had triggered Article 17's right of first refusal. BASF Catalysts denied that Article 17 was triggered by the transaction. Subsequently, BASF Catalysts discontinued discussions with INEOS Polymers concerning plant improvements unless INEOS Polymers "abandoned its efforts to exercise the right of first refusal." R.50-2, ¶ 48.

## B. District Court Proceedings

INEOS Polymers brought an action in the United States District Court for the Northern District of Illinois against BASF Catalysts and BASF AG alleging breach of contract and tortious interference with contractual rights, respectively. BASF Catalysts and BASF AG moved to dismiss the complaint on various grounds, one of which was that INEOS Polymers was an impermissible assignee of the Supply Agreement and, therefore, could not enforce the rights set forth in that agreement. The district court agreed and dismissed INEOS Polymers' amended complaint on the ground that, as an impermissible assignee, it could not maintain an action to enforce the contract.

INEOS Polymers moved for reconsideration and for leave to file a second amended complaint; the district court granted the motions, but again dismissed the complaint with prejudice on the same ground. The district court summarized its holding accordingly:

In sum, the bottom line remains that INEOS is just not an entity owned 50% or more, directly or indirectly, by Amoco Corporation. And that being so, it is not within the limited universe of permitted assignees that was carefully marked out by the original contracting parties when they put their deal together. Hence the motion to reject INEOS' attempted enforcement of Art. 17.A is well taken. And that calls for dismissal not only of the [second amended complaint] but also of the action itself, for INEOS' successive struggles to escape that result have confirmed that the basic defect on which this Court has elaborated at some length, both in Opinion I and this opinion, is not curable.

R.64 at 8.[5]

## II

## DISCUSSION

As we have just noted, the sole basis on which the district court granted the defendants' motion to dismiss was that INEOS Polymers could not enforce any rights under the contract. According to the district court, the

---

[5] Because the district court dismissed the action on the ground that INEOS Polymers was an impermissible assignee, it did not reach the merits of INEOS Polymers' claims, nor did it address any of the other arguments in support of the motion to dismiss made by BASF Catalysts or BASF AG. On appeal, neither BASF Catalysts nor BASF AG urges us to affirm the district court's judgment on any other ground.

corporate transactions that transformed BP Amoco Polymers into INEOS Polymers involved an assignment of rights under the Supply Agreement to an entity not "owned fifty percent (50%) or more, directly or indirectly, by Amoco Corporation." Therefore, the district court concluded, INEOS Polymers was an impermissible assignee and could not maintain an action for breach of the Supply Agreement vis a vis BASF Catalysts and BASF AG.

"We review de novo a district court's dismissal of a complaint for failure to state a claim. In our review, we must accept the allegations in the plaintiff's complaint as true and draw all reasonable inferences in favor of the plaintiff." *Vill. of DePue, Ill. v. Exxon Mobil Corp.*, 537 F.3d 775, 782 (7th Cir. 2008). A complaint will withstand a motion to dismiss if it provides a "'short and plain statement of the claim showing that the pleader is entitled to relief' that is also sufficient to provide the defendant with 'fair notice' of the claim and its basis." *Windy City Metal Fabricators & Supply, Inc. v. CIT Technical Fin. Servs., Inc.*, 536 F.3d 663 (7th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1964 (2007); Fed. R. Civ. P. 8(a)(2)). "In order to demonstrate that he is entitled to relief, however, the pleader must show through his allegations that 'it is plausible, rather than merely speculative, that he is entitled to relief.'" *Id.* (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008)).

> When reviewing the dismissal of a breach of contract claim the meaning of the contract "must be determined from the words or language used, and a court cannot

place a construction on the contract which is contrary to the plain and obvious meaning of the language." If the district court determines that the contract is unambiguous, it may determine its meaning as a matter of law. The unambiguous contract controls over contrary allegations in the plaintiff's complaint.

*McWane, Inc. v. Crow Chicago Indus., Inc.*, 224 F.3d 582, 584 (7th Cir. 2000) (quoting *Johnstowne Centre P'ship v. Chin*, 458 N.E.2d 480, 481 (Ill. 1982); additional citations omitted).

## A. Language and Structure of the Supply Agreement

In order to uphold the district court's judgment dismissing INEOS Polymers' action, we must conclude that, based on a clear and unambiguous reading of the Supply Agreement, Article 19.A. requires the parties to obtain the other's consent prior to any change in ownership or control. We do not believe that the language or structure of the contract allows us to reach that conclusion.

First, the district court's interpretation of Article 19.A. is at odds with the common meaning and use of the terms "assignment" and "change in corporate control." We made clear in *Baxter Healthcare Corp. v. O.R. Concepts, Inc.*, 69 F.3d 785 (7th Cir. 1995), that these terms are not synonymous. In that case, Baxter had entered into a distribution agreement with O.R. Concepts. During the term of the agreement, O.R. Concepts sold ninety-five percent of its stock to a third party, Vital Signs. Baxter sued O.R. claiming that it "was in breach of the Agreement because the sale of stock constituted an assignment of O.R.'s interest in the Agreement to Vital Signs. Baxter asserted

that such an assignment was in violation of a provision of the Agreement requiring Baxter's written consent prior to O.R. assigning its interest in the Agreement." *Id.* at 787. We disagreed and explained accordingly:

> Baxter fails to demonstrate how the change of ownership of O.R. stock constitutes an assignment of O.R.'s interests in the Agreement. It is well settled that a change in corporate ownership does not constitute a variation of that corporation's contractual obligations. *U.S. Can Co. v. NLRB*, 984 F.2d 864, 868 (7th Cir. 1993) ("A sale of stock, like a merger, does not affect the contractual obligations of the corporation."); *United States Shoe Corp. v. Hackett*, 793 F.2d 161, 163-164 (7th Cir. 1986). Baxter ignores the most fundamental characteristic of a corporate entity: its independence. *Flynn v. Allis Chalmers Corp.*, 634 N.E.2d 8, 10 ([Ill. App. Ct.] 1994) ("In Illinois, a corporation is deemed a distinct legal entity, separate from other corporations with which it may be affiliated."); *Peoples Energy Corp. v. Illinois Commerce Comm'n,* 492 N.E.2d 551, 558 ([Ill. App. Ct.] 1986) ("The general rule . . . is that holding companies and their subsidiaries are separate legal entities."). O.R. has at all times remained an independent and functioning organization. That fact has not been affected by its change in ownership. The most persuasive demonstration of this is that Baxter itself chose O.R. as the proper party to sue in this action, not its owners. Because the change in stock ownership did not change O.R.'s obligations under the Agreement, O.R.'s interests in the Agreement are still O.R.'s interests. They have not been assigned to anyone.

*Id.* at 788 (parallel citations omitted). Absent special circumstances, therefore, a change in ownership does not affect the contractual obligations of the company, that is, it does not effect an assignment of rights.

Applying this general rule to the present circumstances, the transfer of BP Amoco Polymers stock to another company did not constitute an assignment of rights for purposes of Article 19.A. Article 19.A. addresses only assignments of rights under the Supply Agreement. It does not define the term "assignment" or "assign"; therefore, according to Illinois law, the term must be accorded its common and usual meaning. *See Dean Mgmt., Inc. v. TBS Const., Inc.*, 790 N.E.2d 934, 940 (Ill. App. Ct. 2003) ("Because the contract does not define 'written notice,' we must give the term its common and generally accepted meaning." (internal citations omitted)); *Michigan Ave. Nat'l Bank of Chicago v. Evans, Inc.*, 531 N.E.2d 872 (Ill. App. Ct. 1988) ("Since the lease does not define the term 'sale', it will be assumed that the word is intended to be used in its usual meaning."). As set forth above, the general rule is that a change in corporate ownership does not effectuate an assignment of rights. *Baxter Healthcare*, 69 F.3d at 788 ("It is well settled that a change in corporate ownership does not constitute a variation of that corporation's contractual obligations.").

BASF Catalysts acknowledges this general rule, however, it claims that, in the present case, the general rule simply does not apply: "The distinction that INEOS ignores is that those cases simply stand for the proposition that non-assignment clauses are not generally triggered by changes in control of a contracting party . . . ." Appellee's Br. at

16. This general principle, BASF Catalysts continues, "is contrasted with Article 19.A. of the Agreement, which specifies that no *change in control* of Amoco Chemical from Amoco Corporation, or of CRI from Phillips, would be permitted without the consent of the other party." *Id.* (emphasis added).

We cannot agree that the language of Article 19.A. takes it outside of the general rule articulated in *Baxter Healthcare*. Article 19.A. is completely silent with respect to a change in ownership or a change in control. By contrast, it explicitly addresses assignments of the Supply Agreement and provides that, with an exception for certain intra-corporate transfers, the rights may not be assigned absent consent by the parties.

Essentially, the district court read the exception in the first sentence of Article 19.A.,[6] not as providing a more permissive approach for assignments to affiliated corporations, but as prohibiting any change in ownership without prior consent. However, we cannot square the district court's reading of Article 19.A. with general rules of contract interpretation or with the other provisions of the

---

[6] *See* R.50-2, Ex. A at 95-96 ("Neither party may assign this Agreement, or any part thereof, without the prior written consent of the other, *except that Amoco may assign this Agreement in its entirety only without the consent of CRI at any time to an entity owned fifty percent (50%) or more, directly or indirectly, by Amoco Corporation*, and CRI may assign this Agreement in its entirety only without the consent of Amoco to any company one hundred percent (100%) owned, directly or indirectly, by Phillips.") (emphasis added).

Supply Agreement. The "except" clause of Article 19.A. follows the absolute bar to assignment of contractual rights found earlier in the same sentence: "Neither party may assign this Agreement, or any part thereof, without the prior written consent of the other . . . ." The "except" clause, therefore, provides a permissive exception to the general prohibition of assignment of contractual rights to affiliate entities.

Furthermore, the district court's interpretation of Article 19.A. makes other portions of that article superfluous. According to the district court, any change in corporate ownership is governed by the consent requirement of Article 19.A.; in other words, any successor corporation also is an assignee for purposes of Article 19.A. However, the provision at the end of Article 19.A.—that the Supply Agreement should be binding on the parties' "successors and permitted delegatees and assignees"—does not treat successors and assignees as interchangeable. Therefore, equating successors and assignees, for purposes of Article 19.A., would violate the principle of contract interpretation that "meaning and effect must be given to every part of the contract including all its terms and provisions, so no part is rendered meaningless or surplusage unless absolutely necessary." *Coles-Mountie Elec. Co-op. v. City of Sullivan*, 709 N.E.2d 249, 253 (Ill. App. Ct. 1999); *see also Miniata v. Ed Miniata, Inc.*, 315 F.3d 712, 715 (7th Cir. 2002) (applying the Illinois rule of construction).

Finally, the district court's interpretation of Article 19.A. would render meaningless much of Article 17 and, therefore, violate the same rule of construction. If Article 19.A.'s

language governing assignments also prohibits any change of control or ownership without consent, then Article 17's specific proscription of Phillips' ability to "sell, transfer, assign, grant any option with respect to, merge or otherwise dispose of any of the ownership or control of CRI," absent certain conditions being met, is mere surplusage. Article 17 specifically addresses a change in corporate control. It provides that neither CRI nor Phillips shall "sell, transfer, assign, grant any option with respect to, merge *or otherwise dispose of any of the ownership or control of CRI*" absent certain conditions being met, namely Amoco being afforded the right of first refusal. R.50-2, Ex. A at 95-96 (emphasis added).[7] The separate mention of "dispos[ition] of any of the ownership or control of CRI" demonstrates that, with respect to Article 17.A, the parties chose to mention explicitly a change in ownership or control, but, with respect to Article 19.A., did not.

In sum, according the terms of the Supply Agreement their usual meaning and giving effect to all of the terms of the Supply Agreement, we cannot conclude that the face of the contract is susceptible only to the district court's interpretation. By contrast, the language and structure of the Supply Agreement strongly suggest that

---

[7] Given that the CD-Catalyst was "vital" to the polypropylene production of Amoco Chemical and its licensees, it is understandable why it would insist on a right to first refusal. It needed to ensure that whoever succeeded to CRI's business was capable of producing the CD-Catalyst according to specifications, within the parties' pricing structure, for the long term. *See* R.50-2 ¶ 2.

Article 19.A. is a provision meant to address only assign-ment of rights. Because the corporate mutations that occurred between 1992 and 2006 on Amoco's side of the Supply Agreement did not involve assignments of rights that required consent by CRI (or its successors), INEOS Polymers is not an impermissible assignee. Consequently, at this stage in the litigation, we cannot conclude that INEOS Polymers is unable to prosecute this action against BASF Catalysts and BASF AG.

## B.  Course of Performance

The parties' course of performance over the life of the Supply Agreement also calls into question the district court's interpretation. With respect to all of the corporate reorganizations and changes in ownership during the life of the Supply Agreement, no party raised Article 19.A. as a barrier to any transaction until the present dispute arose. By contrast, the documents executed at the time of each of the transfers of ownership of CRI (or one of its successors) showed that the parties understood that Article 17.A., giving Amoco a right to first refusal, not Article 19.A.'s assignment language, was implicated by the sale.[8]

---

[8]  The letters with respect to the sale of CRI to Mallinckrodt are not attached to the Second Amended Complaint, but their contents are alleged in ¶ 35. *See* R.50-2. These allegations must be accepted as true for purposes of a motion to dismiss. *Vill. of DePue, Ill. v. Exxon Mobil Corp.*, 537 F.3d 775, 782 (7th Cir. 2008). The letter with respect to the sale by Mallinckrodt

(continued...)

Furthermore, for its part, BASF Catalysts has not been able to articulate with any consistency which corporate changes it believed were impermissible and why it did not object, contemporaneously, to those assignments. For instance, in the district court, BASF Catalysts initially claimed that the merger of Amoco with a BP subsidiary (with the consequent change in ownership of Amoco Polymers) was an impermissible assignment, *see* R.36 at 8-9; however, it never introduced evidence of a contemporaneous objection to that change in ownership under Article 19.A. It subsequently changed its position in the district court and stated that it was not objecting to the merger with BP, but offered no rationale why it was abandoning this claim. *See* R.56 at 6 n.2. However, BASF Catalysts now offers the following explanation as to why the creation of BP Amoco Polymers, after the merger of Amoco Corporation with a BP subsidiary, was acceptable: "The change of ownership language applied only to Amoco Chemical and CRI; their ownership by intermediate companies was irrelevant, so long as they were ultimately owned by Amoco Corporation and Phillips (or their successors)." Appellee's Br. at 23.

Given BASF Catalysts' evolving position with respect to the BP merger, it is hard to disagree with INEOS Polymers' claim that "BASF had to invent this distinction in

---

[8] (...continued)

to Engelhard, *see* R.50-2, Ex. B, as well as the leaseback agreements entered by Engelhard, *see* R.50-2, Exs. C and D, are all attached to the Second Amended Complaint and reference Article 17, but make no mention of rights under Article 19.A.

order to explain why INEOS Holding's acquisition required consent but the prior transactions involving BP and BASF's own acquisition of Engelhard did not." Reply Br. at 9. It is difficult to reconcile this new argument of BASF Catalysts with its stated understanding of Article 19.A.—that it is a general prohibition against one party "foist[ing] an entity controlled by a stranger onto the other without the other's consent." *See* Appellee's Br. at 7.

Ineos Polymers alleged in its complaint conduct by the parties that strongly suggests that the parties understood that the requirements of Article 17, as opposed to those of Article 19.A., were implicated by changes in corporate ownership. These allegations, when taken as true, serve as further evidence that the district court's interpretation of the Supply Agreement cannot be upheld as a matter of law. *Cf. Harris Trust & Sav. Bank v. Hirsch*, 445 N.E.2d 1236 (Ill. App. Ct. 1983) ("[W]hile conduct is not conclusive, the court will look to the parties' action under a contract as strongest evidence of their meaning since the parties to an agreement know best what they meant.").[9]

### Conclusion

For the reasons set forth above, it is not clear from the face of the contract that INEOS Polymers is an impermissible assignee—the sole basis for the district

---

[9] Because we determine that the contract language is susceptible to a reading that allows INEOS Polymers to maintain this action, we need not reach, at this stage in the litigation, INEOS Polymers' arguments concerning waiver and estoppel.

court's dismissal of INEOS Polymers' action against BASF Catalysts and BASF AG. Consequently, the judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion. Circuit Rule 36 shall apply. INEOS Polymers may recover its costs in this court.

REVERSED and REMANDED