NOTICE
Decision filed 01/04/21. The text of this decision may be changed or corrected prior to the filing of a Petiion for Rehearing or the disposition of the same.

2021 IL App (5th) 200036-U

NO. 5-20-0036

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| PAYROLL SERVICES BY EXTRA HELP, INC., an Illinois Corporation, and TERESA KATUBIG, | ) ) ) | Appeal from the Circuit Court of Williamson County. |
| Plaintiffs and Counterdefendants-Appellants, | ) ) | |
| v. | ) ) | No. 15-MR-74 |
| KIMBERLYN HAAG, | ) ) | Honorable Carey C. Gill, |
| Defendant and Counterplaintiff-Appellee. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in finding that the second report submitted by the defendant's expert was a valuation in compliance with section 10 of the parties' shareholder agreement, and in declaring that the fair market value of the defendant's shareholder interest in the company was the average of the valuations prepared by the plaintiffs' expert and the defendant's expert. The trial court's decision to grant the defendant's amended motion for summary judgment and deny the plaintiffs' second motion for summary judgment is affirmed.

¶ 2    The plaintiffs, Payroll Services by Extra Help, Inc. (Payroll Services), and Teresa Katubig, filed an action for declaratory judgment against the defendant, Kimberlyn Haag, in the circuit court of Williamson County. The action arose over a disagreement as to a

1

valuation of Haag's 25% shareholder interest in Payroll Services by Haag's expert. The circuit court denied Haag's initial motion for summary judgment, finding that the calculation analysis prepared by Haag's expert was not a "valuation" within the meaning of the parties' shareholder agreement. Subsequently, the circuit court granted Haag's amended motion for summary judgment. The court determined that the second report prepared by Haag's expert constituted a valuation under the shareholder agreement, and it declared that the fair market value of Haag's shares was the average of the valuations by the plaintiffs' expert and Haag's expert. On appeal, the plaintiffs claim that the circuit court erred in finding that the second valuation by Haag's expert constituted a proper "valuation" as required by the parties' shareholder agreement. For reasons that follow, we affirm.

¶ 3                              I. BACKGROUND

¶ 4     On January 1, 2010, Teresa Katubig and Kimberlyn Haag entered into a "Shareholder Agreement for Payroll Services by Extra Help, Inc." (Agreement). At that time, Payroll Services was an Illinois corporation in the business of handling payroll and payroll-related compliance for other companies. Katubig was the president of Payroll Services and owned 75% of the shares in the company. Haag was employed by Payroll Services and owned 25% of the shares.

¶ 5     On March 28, 2014, Payroll Services terminated Haag's employment. In a letter dated April 2, 2014, plaintiffs' counsel confirmed Haag's termination and placed Haag on notice that Payroll Services was exercising its option to purchase her shares pursuant to section 5 of the Agreement. Counsel also notified Haag that Payroll Services was in the process of preparing a "Fair Market Value Determination" of her shares pursuant to section

10 of the Agreement, and that Haag, at her own expense, could obtain a separate valuation by a business valuation company of her choosing. Counsel noted that pursuant to section 12 of the Agreement, the closing for the purchase of Haag's shares was to occur "on or before ninety (90) days of your employment termination (*i.e.*, June 29, 2014)." Later in April 2014, Haag was notified that the accounting firm "Anders Minkler Huber & Helm LLP" (Anders) would prepare a valuation on behalf of the plaintiffs.

¶ 6    On May 12, 2014, Haag's attorney informed the plaintiffs that Haag would like to proceed with Anders performing a valuation, and that Haag would decide whether to obtain her own valuation after she reviewed the Anders valuation and all of the documents provided to Anders for the valuation. Haag's attorney also indicated that Haag understood the date for closing on the sale of her shares would be delayed if she elected to have a separate valuation of her shares. Later in May, and prior to receipt of the Anders valuation, Haag notified the plaintiffs that she had decided against a "mutually agreed upon" valuation by Anders. Haag indicated that she had selected Kemper CPA Group LLC (the Kemper Group) to prepare her valuation.

¶ 7    On July 3, 2014, Michael Morhaus, a certified public accountant employed by Anders, completed "a valuation engagement" for the purpose of buying out Haag's shares. Based upon his analysis, Morhaus "concluded that the fair market value of a 25% interest in *Payroll Services by Extra Help, Inc.*, as of December 31, 2013, pursuant to the Company's Shareholder Agreement is $0."

¶ 8    On November 3, 2014, Kimberly Aaron, a certified public accountant employed by Kemper, completed "a calculation analysis" for purposes of determining the fair market

value of Haag's shares. Aaron stated that based upon the valuation procedures that she and Haag had agreed to, "the resulting indication of the value of a twenty-five percent (25%) equity interest in Payroll Services by Extra Help, Inc. is $587,000." In a letter accompanying her analysis, Aaron noted that a "calculation analysis" is performed when the valuator and the client agree on the valuation approaches and methods to be used, and the extent of the procedures that will be performed in calculating the value of the interest. Aaron explained that "[a] calculation analysis does not include all of the valuation procedures required for a valuation analysis," and that if a valuation analysis had been performed, "the results may have been different, and the difference may have been significant."

¶ 9    Subsequently, Haag sought payment for her shares based upon the average of the valuations prepared by Morhaus and Aaron, respectively. The plaintiffs, however, refused to close on the purchase of Haag's shares, claiming that Aaron's calculation analysis was not a valuation within the meaning of section 10 of the Agreement.

¶ 10                    The Quest for Declaratory Relief

¶ 11    On April 9, 2015, the plaintiffs filed a complaint for declaratory judgment in the circuit court of Williamson County. The plaintiffs alleged that Morhaus prepared a valuation of the fair market value of Haag's 25% interest in Payroll Services in accordance with section 10 of the Agreement, and that Aaron prepared a "calculation analysis" which purported to serve as an "estimate of value," but did not meet the requirements of a valuation under section 10 of the Agreement.

4

¶ 12   The plaintiffs sought a judgment declaring that Aaron's calculation analysis was improper and was not a true expression of the fair market value of Haag's shares as contemplated by the Agreement; that the Morhaus valuation was proper and a true expression of the fair market value of Haag's shares under the Agreement; and that the fair market value of Haag's shares should be established solely by the Morhaus valuation. The plaintiffs also asked the court to set a closing date for the sale and transfer of Haag's shares, and to award them their costs, attorney fees, and other relief as the court deemed just, proper, and equitable under the circumstances. The plaintiffs, with leave of court, submitted the valuations prepared by Morhaus and Aaron as exhibits under seal. The Agreement was attached and incorporated into the complaint.

¶ 13   Sections 5 and 10 of the Agreement set forth the terms for the purchase of a shareholder's ownership interest in Payroll Services upon the termination of that shareholder's employment.

"5. Purchase Upon Termination of Employment

If an Active Individual's[1] employment by the Corporation (or any of its subsidiaries) is terminated by either the Active Individual or the Corporation (or its subsidiary) for any reason whatsoever, the Corporation shall have the option to purchase all of the Ownership Interests[2] in the Corporation owned by such Active

---

[1]Section 1 of the Agreement provides that "Active Individual" means "any individual who is an employee, director, or officer of the Corporation, or any subsidiary thereof, and who is designated as such with respect to a Shareholder, on *Exhibit A* attached hereto."

[2]Section 1 of the Agreement further provides that *Exhibit A* "reflect[s] the shares of Common Stock or other capital stock the Corporation acquired and/or owned from time to time by the Shareholders," and that the shares listed in *Exhibit A* are collectively referred to as "*Ownership Interests*." *Exhibit A* of the Agreement showed that on January 1, 2010, Katubig owned 750 shares of Common Stock, and Haag owned 250 shares of Common Stock.

Individual at that time of the Active Individual's termination of employment. The purchase of the Ownership Interests by the Corporation shall be upon the terms and conditions hereinafter provided, and the purchase price shall be the '*Purchase Price*,' as hereinafter defined. \*\*\*

\* \* \*

## 10. Purchase Price

As used herein, 'Purchase Price' for the Ownership Interests purchased under the provisions of the Sections entitled '*Purchase Upon Death*,' '*Purchase Upon Termination of Employment*,' or '*Purchase Upon Permanent Disability*,' '*Purchase Upon Divorce of a Shareholder*,' or '*Involuntary Transfer*' shall be equal to the sum of the fair market value of the Ownership Interest of the Shareholder whose shares are being sold to be determined by the Fair Market Value Determination, as hereinafter defined \*\*\*.

Fair Market Value Determination shall be defined by the valuation of the Corporation by a mutually agreed upon business valuation company. Notwithstanding any provision to the contrary, no valuation shall take into account any discount valuation methods for lack of marketability or minority interests. If there cannot be a mutually agreed upon business valuation company then such valuation shall be the average of two valuations (one chosen by the Corporation and one chosen by the Shareholder whose shares are being sold)."

¶ 14    Section 11 of the Agreement set forth the method for payment of the purchase of ownership interests under several different circumstances. Section 11(b) provides that the purchase price for shares purchased upon the termination of employment "shall be paid in a lump sum *** by the purchasing party in cash, by certified check or money order or by other immediately available funds."

¶ 15    On May 8, 2015, Haag filed an answer and a countercomplaint for declaratory judgment. In the answer, Haag asserted that the Morhaus valuation "purports" to be a valuation in accordance with the Agreement, but she made no answer "to the legal conclusion" that the valuation complied with the requirements of sections 10, 11, and 12 of the Agreement. Haag affirmatively stated that Aaron's valuation was proper and should be used to determine the fair market value of her shares, and she denied all allegations to the contrary.

¶ 16    In the countercomplaint for declaratory judgment, Haag alleged that she was notified on April 2, 2014, that Payroll Services would exercise its option to purchase her shares in the company, and that she was later notified that the plaintiffs selected the Anders firm to prepare the valuation. Haag further alleged that she notified the plaintiffs in May 2014 that she would not agree to have the Anders firm perform the valuation and that she would employ the Kemper Group to value her shares. Haag asserted that the plaintiffs provided the Morhaus valuation to her in July 2014; that she provided Aaron's valuation to the plaintiffs in November 2014; and that thereafter, the plaintiffs refused to purchase her shares based upon the average of the respective valuations, as required by section 10 of the Agreement.

7

¶ 17    Haag sought a judgment declaring that the plaintiffs were obligated to purchase her shares in Payroll Services based upon the fair market value of those shares as provided in the Agreement; and that the fair market value of her shares was the average of the experts' respective valuations, or, in the alternative, in such other amount as the court determined was right, just, and in conformity with the terms of the Agreement. Haag requested attorney fees, costs, interest, and such other relief as the court deemed fit and proper.

¶ 18    On October 1, 2015, the plaintiffs filed an answer to Haag's counterclaim. The plaintiffs denied that Aaron's calculation analysis constituted a "valuation" as required in section 10 of the Agreement. The plaintiffs affirmatively asserted that they provided a proper business valuation "prepared by an independent accounting firm, using a nonbiased and industry-standard methodology," and that they remained ready, willing, and able to acquire Haag's shares pursuant to that valuation.

¶ 19                    The Initial Motions for Summary Judgment

¶ 20    On July 28, 2017, Haag filed a motion for summary judgment and a supporting memorandum. Haag asserted that there were no genuine issues of material fact, and that her request for declaratory relief was clearly supported by the plain language of section 10 of the Agreement. Haag claimed that the plaintiffs had a contractual obligation to purchase her shares for a purchase price equal to the average of the valuations prepared by Morhaus and Aaron, respectively. She noted the word "valuation" was not defined in the Agreement, and that section 10 of the Agreement neither required a "valuation engagement" nor prohibited a "calculation analysis" to determine the fair market value of a shareholder's share in the company. She further noted that the Agreement did not contain any procedures

8

for challenging the methods or approaches used by the valuation analyst. Haag claimed that plaintiffs' counsel drafted the Agreement, and any ambiguities in the Agreement should be construed against the plaintiffs. She further claimed that if the plaintiffs had intended to require a "valuation engagement" consistent with the standards of the American Institute of Certified Public Accountants (AICPA) or other professional standards, plaintiffs' counsel could have inserted those requirements into the Agreement at the time it was drafted. Haag attached supporting exhibits in support of her motion, including the deposition transcripts of Michael Morhaus and Kimberly Aaron, and the AICPA's Statement on Standards for Valuation Services No. 1, issued in June 2007 (Statement on Standards).

¶ 21 On August 11, 2017, the plaintiffs filed a response in opposition to Haag's motion for summary judgment. The plaintiffs argued the fair market value of Haag's shares was to be determined by a "valuation," that the term "valuation" was a specific term of art used in the AICPA's Statement on Standards, and that a calculation analysis was not a "proper" valuation as required by section 10 of the Agreement. The plaintiffs concluded that the Morhaus valuation should be used to determine the purchase price for Haag's shares because it was the only proper valuation before the court. The plaintiffs also relied upon excerpts from the depositions of Michael Morhaus and Kimberly Aaron, and the AICPA's Statement on Standards, in support of their arguments.

¶ 22 Michael Morhaus, a certified public accountant (CPA) and a certified valuation analyst, authored the valuation engagement on behalf of the plaintiffs. Morhaus testified that CPAs prepare both valuation engagements and calculation analyses. Morhaus

explained under AICPA standards, certain reporting requirements are waived when a valuation engagement is prepared for litigation purposes because depositions and trial testimony serve as an oral report. Morhaus testified that his firm was retained by the plaintiffs to conduct a valuation engagement. He stated that the AICPA's reporting requirements were waived because his valuation report was prepared for a litigation matter, and that his firm could prepare the report "however we like." Morhaus testified that a valuation could be prepared using an asset approach, a market approach, an income approach, or a hybrid of those approaches, and that the selection of an approach was a matter of professional judgment. Morhaus acknowledged that section 10 of the Agreement did not prescribe a specific approach for the valuation, other than to prohibit specific discounts due to a lack of marketability or minority interests. Morhaus used an income approach in his valuation. He stated that Payroll Services had an indicated equity value of $337,568, but it also carried debt totaling $514,391, due to payments owed to the companies it had purchased. Morhaus concluded that the value of Payroll Services was $0.

¶ 23    Kim Aaron, a CPA and certified valuation analyst, authored the calculation analysis on Haag's behalf. Aaron testified that when she and Haag initially met, they discussed preparing a valuation engagement. Aaron stated that they subsequently agreed on a calculation engagement because of a lack of reliable financial data and an inability to gain cooperation from Payroll Services. Aaron acknowledged that there were some differences in the preparation of a calculation analysis and a valuation analysis. Aaron testified that a calculation engagement was an agreement between the valuation analyst and the client as to the best course of action to come up with the fair market value of the company. She

10

explained that a valuation engagement entailed a thorough analysis of the industry and the background of the client, adjusting financial statements for the economic reality of the company, performing calculations, and writing a report that basically laid out everything that was done. She stated that a full-blown valuation engagement had a higher standard of documentation of due diligence. Aaron stated that, in her opinion, the financial information provided by Payroll Services did not represent the economic reality of the company. Aaron testified that she used a market-based approach, called a guideline company method approach, and considered information regarding Payroll Services' purchase of similar payroll services companies. Based on her analysis, she determined that Payroll Services had a calculated value of $587,000.

¶ 24    The AICPA's Statement on Standards "establishes standards of performance and reporting for all AICPA members performing those valuation services within the scope of the Statement. It describes "Types of Engagements" as follows:

> "21. There are two types of engagements to estimate value—a ***valuation engagement*** and a ***calculation engagement***. The valuation engagement requires more procedures than does the calculation engagement. The valuation engagement results in a conclusion of value. The calculation engagement results in a calculated value. The type of engagement is established in the understanding with the client (paragraph 16 and 17)."

The Statement on Standards provides that a "valuation performed for a matter before a court, an arbitrator, a mediator or other facilitator, or a matter in a governmental or administrative proceeding, is exempt from the reporting provisions of this Statement." The

Statement on Standards contains an "International Glossary of Business Valuation Terms." The International Glossary defines the term "valuation" as "the act or process of determining the value of a business, business ownership interest, security, or intangible asset."

¶ 25   On October 20, 2017, the trial court entered a three-page order granting in part, and denying in part, Haag's motion for summary judgment. In its order, the court found that there were no genuine issues of material fact, and the only issue was the price to be paid for Haag's shares in Payroll Services. The court noted that the parties did not agree on the meaning of the term "valuation" as used in the Agreement, and whether the calculation analysis by Haag's expert constituted a valuation within the meaning of the Agreement. After considering the arguments of the parties, the court determined that the term "valuation" should be defined in accordance with the definition of "valuation" in the business valuation industry, and that the calculation analysis submitted by Haag's expert was not a sufficient "valuation" under the terms of the Agreement. The court stated that the testimony of Haag's expert, Kim Aaron, was important to its decision. The court pointed out that Aaron acknowledged that a valuation analysis and a calculation analysis were different, and that she performed a calculation analysis. The court further noted that Aaron's testimony and correspondence indicated that she was aware of the precise definition of "valuation" in the business valuations industry. The court granted Haag's request for a declaration that plaintiffs were obligated to purchase her shares in the company pursuant to the terms of the Agreement. The court denied Haag's request for a

12

declaration that the fair market value of her shares was the average of the valuations by the plaintiffs' expert and the defendant's expert.

¶ 26    On October 25, 2017, the plaintiffs filed a motion for summary judgment. The plaintiffs requested a judgment declaring that Haag's shares should be valued in accordance with the Morhaus valuation, as it was the only proper valuation before the court; that Haag's shares should be transferred to plaintiff Katubig; and that Haag should have no further ownership interest in Payroll Services.

¶ 27    On November 20, 2017, Haag filed a motion to reconsider the court's order of October 20, 2017. Therein, Haag argued that the plaintiffs presented no evidence that the parties intended that the term "valuation" should be construed as a "word of art," and that nothing within the Agreement excluded the use of a calculation analysis to determine the fair market value of her shares. Haag claimed that the calculation analysis by her expert was a valuation within the plain and ordinary meaning of the language used in the Agreement. She further claimed that under the AICPA standards, valuation engagements and calculation engagement were acceptable methods to determine the fair market value of shares in a company. Haag asked the court to vacate the order of October 20, 2017, and enter summary judgment in her favor, or, alternatively, an order to certify the question of "valuation" for appellate review. Haag filed the affidavit of Kim Aaron in support of her motion. In the affidavit, Aaron opined that valuation engagements and calculation engagements were acceptable methods of valuation under the AICPA standards, and that her calculation analysis satisfied the AICPA standards and the requirements in section 10 of the Agreement.

13

¶ 28   On November 28, 2017, Haag filed a response in opposition to the plaintiffs' motion for summary judgment. Haag argued that the plaintiffs' motion was based on an erroneous proposition that Aaron's calculation analysis failed to qualify as a valuation of the fair market value of her shares.

¶ 29   On January 25, 2018, the trial court heard arguments on Haag's motion to reconsider and took that matter under advisement. On February 23, 2018, the court entered an order denying Haag's motion to reconsider and alternative motion to certify a question for interlocutory review.

¶ 30   On March 28, 2018, the plaintiffs' motion for summary judgment was called for hearing. After considering the arguments of counsel, the court denied the plaintiffs' motion and, over the plaintiffs' objection, granted Haag leave to obtain a valuation in accordance with the Agreement.

¶ 31          The Second Round of Summary Judgment Motions

¶ 32   On July 19, 2019, Haag filed an amended motion for summary judgment and supporting memorandum, along with the "2018 'Full' Valuation" prepared by Kim Aaron. Haag argued that the submission of the full valuation resolved any issues regarding the sufficiency of Aaron's initial calculation analysis. Haag further argued that the pleadings, depositions, affidavits, and exhibits on file showed there was no genuine issue of material fact and that she was entitled to judgment as a matter of law.

¶ 33   On that same day, the plaintiffs filed their second motion for summary judgment. Therein, the plaintiffs argued that Aaron used the same methodology and analysis in her valuation of November 19, 2018, as used in the prior calculation analysis, and that Aaron's

14

valuation report was the same calculation analysis, with a different title. The plaintiffs attached several supporting exhibits, including Aaron's 2014 calculation analysis, Aaron's 2018 valuation, and Aaron's discovery depositions taken February 17, 2017, and May 15, 2019.

¶ 34    In her second deposition, Aaron testified that on June 14, 2018, she and her firm accepted an engagement to perform a valuation engagement for purposes of determining the fair market value of Haag's shares. Aaron testified that she performed the valuation engagement and reached a conclusion of valuation in compliance with the AICPA's Statement on Standards for Valuation Services. Aaron recalled that in preparing the valuation, she had discussion with Haag regarding the business of Payroll Services, the company's tax returns, and the acquisition of other payroll service companies by Payroll Services. Aaron stated that she conducted additional research and inquiries, including a review of the Payroll Services website, industry research of payroll service companies through a subscription service, and economic research on Payroll Services. Aaron testified that she determined the book value of the company as of the date of the valuation, conducted a comparative analysis of the company over time, and determined that an income stream analysis was not an appropriate methodology for this company, considering the acquisition of new businesses by Payroll Services.

¶ 35    Aaron testified that her report, dated November 19, 2018, was a business valuation, and that her conclusion of value was, in her professional opinion, the fair market value of Haag's shares in the company. Aaron testified that she conducted the business valuation to the best of her ability, given the information she was provided. She stated that every piece

15

of evidence obtained through the more in-depth review and examination of Payroll Services affirmed her earlier opinion that a guideline company valuation method was the most appropriate methodology by which to value Haag's shares, and that the consideration of Payroll Services' recent acquisitions of payroll service companies supported a valuation of Haag's shares in the sum of $587,000. She uncovered nothing in the review that changed her initial opinion. When asked why the details of her investigation were not included in her 2018 report, Aaron stated that the AICPA report writing standards did not apply because the report was prepared for litigation.

¶ 36    On September 27, 2019, the trial court heard arguments on Haag's amended motion for summary judgment and the plaintiffs' second motion for summary judgment. Following the hearing, the court granted Haag's amended motion for summary judgment and denied the plaintiffs' second motion for summary judgment. In a typewritten order, filed September 30, 2019, the court concluded that the November 19, 2018, report prepared by Haag's expert met the definition of "valuation" under the terms of the Agreement. The court entered an order declaring that the fair market value of Haag's shares in Payroll Services was the average of the valuations by Morhaus and Aaron.

¶ 37    On October 15, 2019, the plaintiffs filed a motion to reconsider or clarify portions of the September 27, 2019, order. The plaintiffs sought an order clarifying that Katubig, as an individual shareholder, was not personally obligated to purchase Haag's shares, and correcting a statement indicating that the plaintiffs had admitted that Haag's expert prepared a "full-blown business valuation." The plaintiffs also asked the court to reconsider its order finding that Haag's second analysis was a legitimate business valuation.

16

¶ 38    Following a hearing on December 30, 2019, the court clarified that it made no findings "as to the obligations of any shareholder, nor obligations of the Company," other than the obligation to purchase Haag's shares according to the terms of the Agreement, and that the fair market value of Haag's shares was the average of the valuations of Morhaus and Aaron. The court further noted that in the order of September 27, 2019, it stated that "Haag's expert now states that she prepared 'a full-blown business valuation,' which is admitted by the plaintiffs." The court clarified that phrase, stating that the plaintiffs admitted only that Haag's expert called her subsequent report a valuation, not that the report was a proper valuation. In all other respects, the plaintiffs' motion to reconsider was denied.

¶ 39                                  II. ANALYSIS

¶ 40    On appeal, the plaintiffs claim that the trial court erred in granting Haag's amended motion for summary judgment. Specifically, the plaintiffs challenge the court's finding that the November 19, 2018, report prepared by Kim Aaron of the Kemper Group was a "valuation" of Haag's interest in Payroll Services, within the meaning of the Agreement. The plaintiffs argue that Aaron did not perform a business valuation but instead offered the same "calculation analysis" and renamed it a business evaluation.

¶ 41    Summary judgment is proper where the pleadings, depositions, admissions, and affidavits on file demonstrate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018). A trial court's summary judgment rulings are reviewed *de novo*. *Maxit, Inc. v. Van Cleve*, 231 Ill. 2d 229, 235-36 (2008).

¶ 42  The issue on appeal presents an issue of contract interpretation. In construing a contract, the primary objective is to give effect to the intent of the parties. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232 (2007). A court will initially look to the language of the contract, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent. *Gallagher*, 226 Ill. 2d at 233. Unless a contract clearly specifies its own definitions, the words of the contract must be given their common and generally accepted meaning. *J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.*, 194 Ill. App. 3d 744, 748 (1990). Additionally, because words derive their meaning from the context in which they are used, a court will construe the words within the context of the contract as a whole. *Gallagher*, 226 Ill. 2d at 233. A court may not add language about which the contract is silent, nor add words or terms to an agreement to change the plain meaning as expressed in the agreement. *Dean Management, Inc. v. TBS Construction, Inc.*, 339 Ill. App. 3d 263, 269 (2003). If the language of the contract is unambiguous, the "four corners rule" requires the court to interpret the contract as a matter of law without the use of parol evidence. *Dean Management*, 339 Ill. App. 3d at 269. The construction of a contract presents a question of law that is subject to *de novo* review. *Gallagher*, 226 Ill. 2d at 219.

¶ 43  Section 10 of the Agreement provides that the "Purchase Price" of a shareholder's interest "shall be equal to the sum of the fair market value" of that interest as determined by the "Fair Market Value Determination." Section 10 further defines "Fair Market Value Determination" as "the valuation of the Corporation by a mutually agreed upon business valuation company." Under circumstances where the parties do not mutually agree on a business valuation company, then "such valuation shall be the average of two valuations

18

(one chosen by the Corporation and one chosen by the Shareholder whose shares are being sold)." The sole issue is whether the trial court erred in determining that the November 19, 2018, report prepared by Kim Aaron was a "valuation" under section 10 of the Agreement.

¶ 44    The plaintiffs claim that the trial court erred in finding that Aaron's November 19, 2018, report was a legitimate business valuation. The plaintiffs claim that the word "valuation," as used in section 10 of the Agreement, is a "word of art," which has meaning in the business valuation industry, and they refer to the AICPA's Statement on Standards for Valuation in support of their contention.

¶ 45    Haag argues that "valuation" should be given its plain and ordinary meaning. She also argues that the plaintiffs offered no evidence to show that the word "valuation" was intended as a term of art.

¶ 46    It is undisputed that "valuation" is not defined in the Agreement. The Agreement does not specify the type of engagement required to estimate value. It neither restricts valuations to those performed pursuant to a valuation engagement nor prohibits valuations performed pursuant to a calculation analysis. The Agreement does not mandate any specific valuation method or approach. The plaintiffs correctly note that the parties' experts performed their valuations in conformity with AICPA's Statement on Standards as well as its Code of Professional Conduct. Indeed, the Statement on Standards set forth professional standards applicable to the parties' experts in the performance of their professional responsibilities as certified public accounts. That said, the Statement on Standards was neither referenced nor incorporated into the parties' Agreement. The plaintiffs, as drafters of the Agreement, could have included provisions requiring a valuation analyst to make a

19

fair market valuation determination using only a valuation engagement that complied with the standards of the AICPA, but that was not done here. Significantly, nothing within the four corners of the Agreement restricted the "valuation" to a valuation engagement. Thus, we find error in the trial court's determination that "valuation" should be defined in accordance with the definition of "valuation" in the "business valuation industry." In absence of a definition in the Agreement, the word "valuation" should be assigned its plain and ordinary meaning. *J.M. Beals Enterprises*, 194 Ill. App. 3d at 748.

¶ 47 According to the New Oxford American Dictionary, cited by Haag, "valuation" means "an estimation of something's worth, especially one carried out by a professional appraiser." New Oxford American Dictionary 1912 (3d ed. 2010). Black's Law Dictionary defines valuation as "[t]he process of determining the value of a thing or entity[;] [t]he estimated worth of a thing or entity." Black's Law Dictionary 1548 (7th ed. 1999). Thus, giving valuation its plain and ordinary meaning, we find that Aaron's November 2018 valuation engagement constituted a valuation in accordance with section 10 of the Agreement.

¶ 48 Even if the meaning of "valuation," as defined in the Statement on Standards, was applicable, it would not alter the outcome of this case. The Statement on Standards defines valuation as "the act or process of determining the value of a business, business ownership interest, security or tangible asset," and it recognizes "two types of engagements to estimate [the] value [of a business]—a valuation engagement and a calculation engagement."

¶ 49 Based upon our review of the record, the trial court correctly determined that Aaron's November 19, 2018, valuation satisfied the requirements for a valuation within

20

the meaning of the Agreement. In her second deposition, Aaron testified that she prepared a valuation engagement in 2018, and she gave a detailed account of the research, analysis, and procedures she undertook to meet her professional requirements in performing that valuation engagement. Aaron opined that her additional research and analysis served to affirm the opinions in her calculation analysis. Aaron also opined that her November 19, 2018, report constituted a full-blown business valuation.

¶ 50    The plaintiffs presented no evidence to rebut Aaron's testimony that she complied with her obligations to perform a valuation engagement. That Aaron did not set forth all her industry research and analysis in her report is not a basis for rejection of the report. Again, the Agreement did not require the valuation analyst to detail his or her actions, research, and analysis. In addition, both experts testified that an analyst's valuation report is exempt from reporting requirements when the valuation is performed in anticipation of litigation.

¶ 51                                III. CONCLUSION

¶ 52    In summary, the trial court did not err in finding that Aaron's November 19, 2018, valuation report was a proper valuation under section 10 of the Agreement. Under section 10, the fair market value of Haag's shares was to be determined by the average of the valuation prepared by Morhaus—$0, and the valuation prepared by Aaron—$587,000. There is no provision in the Agreement permitting a court, arbitrator, or administrative agency to review the methods or approaches used by the valuation analysts. We recognize that the valuations of the experts in this case were significantly different. However, it was recognized decades ago that "determination of the fair market value of a closely held

21

corporation is not an exact science, as witnessed by the frequency with which appraisers differ in their opinions concerning the appropriate value to assign to a shareholder's interest." *Hickory Creek Nursery, Inc. v. Johnston*, 167 Ill. App. 3d 449, 454 (1988).

¶ 53   In this case, the trial court correctly determined, based upon the undisputed evidence, that the plaintiffs exercised their option to purchase Haag's shares pursuant to the Agreement. In addition, the trial court correctly determined that the fair market value of the defendant's shares was the average of valuations prepared by Morhaus and Aaron. Accordingly, the judgment of the trial court, granting Haag's amended motion for summary judgment and denying plaintiffs' second motion for summary judgment, is affirmed.

¶ 54   Affirmed.